[No. B007073. Second Dist., Div. Seven. May 16, 1985.]

RICHARD RONALD et al., Plaintiffs and Respondents, v.
4-C'S ELECTRONIC PACKAGING, INC., et al.,
Defendants and Appellants.

COUNSEL

Monteleone & McCrory and Philip C. Putnam for Defendants and Appellants.

White & White and Richard A. White for Plaintiffs and Respondents.

OPINION

THOMPSON, J.—Defendants, 4-C's Electronic Packaging, Inc. (the corporation) and Robert E. Stabler (Stabler), appeal from a judgment of the trial court confirming the majority appraisal valuation of plaintiffs' minority shares in the corporation, which shares were allegedly to be purchased by Stabler or the corporation, for the purpose of preventing the involuntary dissolution of the corporation. (Corp. Code, § 2000.)[1]

Defendants contend on appeal that: (1) the valuation method used by the majority appraisers and adopted by the trial court was erroneous in that (a) it expressly assumed that the concept of fair value contained in section 2000 is equivalent to fair market value, (b) it included a 40 percent control premium in computing the value of the corporation, and (c) it failed to deduct from the valuation the salary liability of the corporation's general manager; and (2) the trial court erroneously designated Stabler as the purchasing party rather than the corporation. None of these contentions, however, specifi-

[1]Unless otherwise noted, all statutory references are to the Corporations Code.

cally relates to what we find to be the critical issue: whether the trial court's sole reliance on the price-earnings approach to determine the value of the corporation was improper, and constituted prejudicial error. We observe that although the issue of the valuation procedure was raised below, and the evidence on the point was uncontroverted, this specific issue went unmentioned. We invited the parties to brief the matter, which they have done. We conclude that, as a matter of law, the judgment must be reversed because sole reliance on the price-earnings method to determine the value of closely held shares constitutes prejudicial error.

### FACTS AND PROCEEDINGS BELOW

The corporation is a closely held California corporation engaged in the business of manufacturing custom electronic assemblies, for the medical, computer, power generation, and military electronics industries. Plaintiff, Richard Ronald, owns 22,000 shares of common stock of the corporation. The other plaintiff, Henry Barkley, owns 2,500 shares, which, together with Ronald's shares, constitutes 49 percent of the total issued and outstanding shares of common stock of the corporation. The other 51 percent of the outstanding shares of common stock of the corporation, namely, 25,500, is owned by Stabler.

On January 14, 1983, plaintiffs filed a complaint against the defendants, seeking the involuntary dissolution of the corporation on the grounds that there is internal dissension and two factions of shareholders in the corporation are so deadlocked that its business can no longer be conducted with advantage to its shareholders. They also filed an application for an order to show cause and temporary restraining order to enjoin the holding of a special shareholders' meeting, scheduled for January 17, 1983, which was granted by the trial court. In addition to filing an answer to the complaint, Stabler filed on March 8, 1983, a cross-complaint against the plaintiffs and the corporation. In his cross-complaint, Stabler sought to avoid dissolution by purchasing the shares of the plaintiffs himself, or being authorized by the court, to vote his 25,500 shares to permit the corporation to purchase the shares of the plaintiffs. Stabler applied and obtained an order from the trial court shortening the time to hear his motion to appoint appraisers to determine the fair value of the plaintiffs' shares.

On March 17, 1983, after hearing, the trial court issued an order which provided inter alia for a stay of the dissolution proceedings and a preliminary injunction enjoining Stabler from calling a meeting of shareholders of the corporation. The trial court also set the amount of bond for the preliminary injunction and specified the procedure for the appointment of three appraisers. The trial court directed the appraisers, or a majority of them, to determine the fair value of the shares owned by Ronald and Barkley, "on

the basis of the liquidation value of the corporation, but taking into account the possibility, if any, of sale of the entire business as a going concern in liquidation." In accordance with the court's order, plaintiffs selected William D. May as an appraiser, Stabler selected Robert Howard and Sheldon Bolotin collectively (Bolotin) as his one appraiser. May and Bolotin together then selected Anthony Abel as the third appraiser.

All three appraisers cooperated in the gathering of information. However, a difference of opinion arose concerning the appropriate methodology to employ. Bolotin elected to submit an independent appraisal, while May and Abel jointly filed an appraisal report.

On July 29, 1983, Bolotin filed an appraisal report determining the value of the corporation, as of June 30, 1983, to be $190,000. Using the asset approach, Bolotin first determined the value of the corporation's underlying tangible assets to be $168,000. Next, he adjusted the $168,000 upwards to $190,000 by adding $22,000 for the corporation's organizational and assemblage assets. Under this $190,000 valuation, Bolotin determined that each of the 50,000 outstanding shares was worth $3.80. Then, using the figure of $3.80 per share, he set the pro rata interest of Ronald, based on 22,000 shares, at $83,600, and Barkley's interest, based on 2,500 shares, at $9,500. This valuation, however, did not include the contingent liability of the corporation for the $30,000 in wages paid by Stabler to Dave Graham for acting as general manager of the corporation. He, therefore, further determined that if the contingent liability of $30,000 was included, thus reducing the valuation to $160,000, the worth of each share would be $3.20, resulting in a reduction of Ronald's interest to $70,400, and that of Barkley to $8,000.

Thereafter, on August 4, 1983, the other two appraisers, Abel and May, submitted to the trial court a joint appraisal report in which they determined the fair value of the corporation, as of June 30, 1983, to be $250,000. In their report, they expressly assumed that "fair value" is equivalent to fair market value, which they defined as the amount at which property would equitably exchange between a willing seller and a willing buyer when neither is acting under compulsion and when both have reasonably complete knowledge of all relevant facts. To determine the fair market value of the corporation, they used the price-earnings ratio of certain publicly traded corporations to arrive at multiples of six and seven. Next, they estimated the earnings of the corporation after taxes to be $34,000. Then they multiplied those earnings separately by the selected price-earnings ratio multiples of 6 and 7, added a 40 percent control premium to each sum due to Stabler's controlling interest, and then discounted the respective sums by 20 percent for the lack of liquidity of the corporation's shares. The resulting sums were

rounded to $230,000 and $270,000 respectively. Next, they chose the mid-point, or $250,000, as the value of the corporation, making each share of the corporation worth $5. Finally, using the figure of $5 per share, they set the interest of Ronald at $110,000, and that of Barkley at $12,500.[2]

Following the submission of the two appraisal reports to the trial court, the plaintiffs and Stabler through their respective attorneys on August 5, 1983, entered into a written stipulation. The stipulation provided inter alia that Ronald and Barkley would resign as directors, officers, and employees of the corporation and that the preliminary injunction against Stabler would be dissolved upon Stabler depositing $100,000 in cash in an account in the name of John S. Byrnes, Jr., as trustee for Stabler-4-C's purchase, as security and for the purchase of the shares owned by Ronald and Barkley. On September 27, 1983, the trial court issued an order, approving and adopting the stipulation.

Due to the wide difference of opinion between the two reports as to the value of the corporation, the trial court on September 27, 1983, appointed Richard Berger, an attorney, as Master to assist the court in arriving at the fair value of shares owned by Ronald and Barkley. The court directed the Master inter alia to examine all documents, including the appraisal reports, pleadings and motions, conduct necessary hearings, hear argument, and make findings of fact.

On October 13, 1983, the Master requested a hearing for the purpose of taking the testimony of the appraisers, which was held on November 22, 1983. Thereafter, on November 28, 1983, the Master submitted his findings to the trial court, concluding that the joint appraisal of May and Abel accurately valued the corporation in the amount of $250,000. In his findings, the Master stated inter alia that May and Abel properly followed the definition for determining the fair value contained in section 2000 by using "a price earnings approach" and also by considering the salability of the entire business as a going concern.

On January 21, 1984, plaintiffs filed a petition to confirm the Master's findings and for entry of judgment. On February 1, 1984, Stabler and the

---

[2]The computation is as follows:

|  | Low | High |
| --- | --- | --- |
| "Projected Net Income | $ 34,000 | $ 34,000 |
| × Assumed Multiple | 6 | 7 |
| Aggregate Minority Interest Value | 204,000 | 238,000 |
| Plus 40% Ownership Premium | 81,600 | 95,200 |
| Aggregate Majority Interest Value | 285,600 | 333,200 |
| Less 20% Liquidity Discount | 57,120 | 66,640 |
| Controlling Interest Value for 4-C's | 228,480 | 266,560 |
| Rounded to | $230,000 | $270,000" |

corporation filed their opposition, contending that the valuation method used by May and Abel was erroneous as a matter of law in not complying with the valuation method specified in section 2000. They also filed a counter-petition to reject the Master's findings and to confirm Bolotin's appraisal report, together with an election specifying the corporation as the purchasing party of the shares. On February 17, 1984, the trial court issued its tentative decision, adopting the Master's findings and expressly granting plaintiffs' petition, denying Stabler's counterpetition, and denying defendants' election of the corporation as the purchasing party. On April 12, 1984, judgment was entered in conformance with the tentative decision.

## DISCUSSION

## I

## DETERMINATION OF FAIR VALUE

The proceeding for the involuntary dissolution of a corporation, while it is applicable in theory to any corporation, will in most cases, as here, involve a closely held corporation. (See 3 Marsh, Cal. Corporation Law (2d ed. 1981) § 21.29, p. 56.) To avoid such a dissolution, section 2000[3] provides a statutory "buy out" procedure to permit the purchase of the

---

[3]Section 2000, before 1983 amendments, provided in pertinent part: "(a) . . . [I]n any proceeding for voluntary dissolution initiated by the vote of shareholders representing only 50 percent of the voting power, the corporation or, if it does not elect to purchase, the holders of 50 percent or more of the voting power of the corporation (the 'purchasing parties') may avoid the dissolution of the corporation and the appointment of any receiver by purchasing for cash the shares owned . . . by the shareholders so initiating the proceeding (the 'moving parties') at their fair value. The fair value shall be determined on the basis of the liquidation value but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation. In fixing the value, the amount of any damages resulting if the initiation of the dissolution is a breach by any moving party . . . of an agreement with the purchasing party . . . may be deducted from the amount payable to such moving party . . . .

"(b) If the purchasing parties (1) elect to purchase the shares owned by the moving parties, and (2) are unable to agree with the moving parties upon the fair value of such shares, and (3) give bond with sufficient security to pay the estimated reasonable expenses (including attorneys' fees) of the moving parties if such expenses are recoverable under subdivision (c), the court upon application of the purchasing parties, either in the pending action or in a proceeding initiated . . . by the purchasing parties in the case of a voluntary election to wind up and dissolve, shall stay the winding up and dissolution proceeding and shall proceed to ascertain and fix the fair value of the shares owned by the moving parties.

"(c) The court shall appoint three disinterested appraisers to appraise the fair value of the shares owned by the moving parties, and shall make an order referring the matter to the appraisers so appointed for the purpose of ascertaining such value. The order shall prescribe the time and manner of producing evidence, if evidence is required. The award of the appraisers or of a majority of them, when confirmed by the court, shall be final and conclusive upon all parties. The court shall enter a decree which shall provide in the alternative

shares of the plaintiffs seeking dissolution by the closely held corporation, or if it does not elect to purchase, by the holders of 50 percent or more of the voting shares of the corporation. The shares must be purchased for cash at their "fair value." The difficulty facing the trial court, however, in such a situation is how to determine the value of the closely held corporation in order to place a value on the shares to be purchased, and to know that such value is appropriate, accurate, and fair.

Little help, if any, is provided by the statutory procedure which governs the appraisal process in a dissolution proceeding of a closely held corporation. Section 2000, subdivision (a), merely provides two provisions relating to the method of determining the value of the shares to be purchased. That subdivision provides: "The fair value shall be determined on the basis of the liquidation value but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation."

One commentator, in explaining these provisions in section 2000, subdivision (a), stated: "Since the moving parties [plaintiffs] have initiated a dissolution proceeding pursuant to which the corporation will be liquidated unless the other shareholders buy them out or otherwise defeat their objective of having a liquidation of the corporation . . . [it is apparent] that the moving parties [plaintiffs] should not be entitled to more than the liquidation value of the shares, i.e., what they would receive if their objective is obtained. On the other hand, a liquidation does not necessarily contemplate that the assets will be sold piecemeal and the goodwill of the business sacrificed by a termination of the business. In such a liquidation it may be possible to sell the entire business as a going concern, although there would probably be no market or purchaser for merely a minority or a 50% interest in such a closely-held corporation. If that is true, then the moving parties [plaintiffs] should be entitled to a value which takes into account that possibility, since such a sale of the entire business as a going concern could be made in the liquidation if the dissolution were permitted to proceed." (2 Marsh, Cal. Corporation Law (2d ed. 1981) § 20.22, p. 638.)

▉▉▉ Recently, in *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874 [191 Cal.Rptr. 392], we held, as the court did in *In re Marriage of*

---

for winding up and dissolution of the corporation unless payment is made for the shares within the time specified by the decree. If the purchasing parties do not make payment for the shares within the time specified, judgment shall be entered against them and the surety or sureties on the bond for the amount of the expenses (including attorneys' fees) of the moving parties . . . .

"(d) If the purchasing parties desire to prevent the winding up and dissolution, they shall pay to the moving parties the value of their shares ascertained and decreed within the time specified pursuant to this section, or, in case of an appeal, as fixed on appeal. . . ."

*Lotz* (1981) 120 Cal.App.3d 379, 384 [174 Cal.Rptr. 618], that the price-earnings method may be used to determine the value of closely held shares, but that it could not be the sole method relied upon for such valuation.

In *Hewitson,* we also discussed the different methods used to determine the investment value and market value of shares, and the difference between them. In our discussion of this difference, we enumerated the three historical methods that have been used to determine the investment value, not the market value, of closely held stock: capitalization of earnings, capitalization of dividends, and net asset value. We noted that, unlike publicly held stock which has a readily determined market value, closely held stock is not actively traded and, therefore, has no established market value. We concluded that if an active market existed for the stock, its market value could be determined, but if none existed then its investment value should be determined. (142 Cal.App.3d at pp. 881-883.)

More importantly, we recognized in *Hewitson* that the determination of the value of closely held stock is a difficult legal problem, and urged the trial court to use the factors listed in Internal Revenue Ruling 59-60 (1959-1 Cum. Bull. 237) in such determination, unless there is some statutory or decisional proscription on their use. (142 Cal.App.3d at p. 888.)

For example, in *Brown* v. *Allied Corrugated Box Co.* (1979) 91 Cal.App.3d 477, 486 [154 Cal.Rptr. 170], the court did not follow the practice in the area of taxation to devalue minority shares in a closely held corporation, which is permissible under Revenue Ruling 59-60. (See, e.g., *Righter* v. *United States* (1971) 194 Ct.Cl. 400 [439 F.2d 1204, 1218]; also see Annot., Valuation of Closely Held Stock for Federal Estate Tax Purposes Under Section 2031(b) of Internal Revenue Code of 1954 (26 USCS § 2031(b)), and Implementing Regulations (1975) 22 A.L.R.Fed. 31, 72-74.) ■ Rather, the *Brown* court held that where a decision is made to buy the plaintiffs' shares to avoid a dissolution of the corporation, the shares are *not* to be devalued even though they represent a minority interest in the corporation. (91 Cal.App.3d at pp. 485-487.) The court then emphasized that "there is no question but that the lack of control inherent in plaintiffs' minority shares would substantially decrease their value if they were placed on the open market." (*Id.,* at p. 486.) The court reasoned that "[h]ad plaintiffs been permitted to prove their case and had the corporation then been dissolved, it is clear that upon distribution of the dissolution proceeds each of the shareholders would have been entitled to the exact same amount per share, with no consideration being given to whether the shares had been controlling or noncontrolling. [Fn. omitted.]" (*Ibid.*)

We agree with the *Brown* court that the lack of control inherent in plaintiff's minority shares should not be devalued under the statutory "buy-out"

procedure of section 2000. We disagree with *Brown,* however, on whether a premium should be added where the shares under purchase consideration represent a majority and constitute control. Although it is difficult to envision a factual situation where the statutory "buy out" procedure of section 2000 would be used to purchase the controlling shares, if such a situation were to occur, a premium should be accorded these shares for control. "Control of a business essentially is the power to dominate its decision-making processes. Those who possess control not only have the power to institute ideas and programs in their self-interest but, more importantly, they can ensure that others cannot use the business and its assets in ways that are contrary to the majority's needs and desires. Thus, controlling shares are valued more highly than minority shares. [Fns. omitted.]" (Fellows & Painter, *Valuing Close Corporations For Federal Wealth Transfer Taxes: A Statutory Solution to the Disappearing Wealth Syndrome,* (1978) 30 Stan.L.Rev. 895, 903-904; Vinso & Marcus, *Valuing the Closely-Held Company: The Implications of the Hewitson Case,* L.A. Daily J. Rep. No. 85-1 (Jan. 25, 1985) pp. 3-6.)

■ Recently, in commenting on the *Hewitson* case, Professors Joseph D. Vinso and Burton H. Marcus discussed how each factor listed in Revenue Ruling 59-60 should be considered in an appropriate valuation of closely held shares. They also discussed five valuation approaches, the combination of which will determine the value of a minority interest in a closely held corporation. These valuation approaches, employing all of the factors of Revenue Ruling 59-60, are adjusted net worth, capitalization of income stream, capitalization of earnings before interest and tax, discounted cash flow, and market comparables.[4] (See Vinso, *Valuing The Closely-Held Cor-*

---

[4]Professors Vinso and Marcus described the five methods as follows: "*Adjusted Net Worth.* This method adjusts the book value to indicate the value of the various assets as of the valuation date(s). Current assets are assumed to be at market value. However, the market value of tangible assets needs to be determined and substituted for the book value of fixed assets. Similarly, the market value of intangible assets must be established. (In most cases, the only acceptable method under the circumstances here are those specified by IRS Revenue Ruling 68-609.)

"The summation of the current, fixed, and intangible assets then constitutes the total market value of assets. From this value, liabilities are deducted; the result is the adjusted net worth. . . .

"*Capitalization of Income Stream.* In this method, the earnings after tax are determined, adjusted for the impact of working capital, and capitalized at an appropriate rate. If additional working capital is needed, the interest cost of obtaining that capital is subtracted from earnings available to stockholders. The equity capitalization rate . . . . involves determining an average risk premium based on values for publicly traded stocks engaged in the same line of business. Thus, this methodology combines the capitalization of earnings and the use of market prices . . . . [See James C. Van Horne, Financial Management & Policy (6th ed. 1983) Prentice-Hall, Englewood Cliffs, N.J.]

"*Capitalization of Earnings Before Interest and Tax.* Here, the expected net operating income (earnings before interest and taxes) is determined along with the growth of earnings. This value is capitalized at the average weighted cost of capital which is a function of the

*poration,* Working Paper (Unpub. Monograph, Apr. 1985) School of Business Administration, University of Southern California, for a more detailed, up-to-date discussion of procedures to establish an appropriate value of closely held corporation.) They concluded that "[u]sing the five methods outlined here considers all the factors noted in IRS 59-60, which the [*Hewitson*] Court prescribed and good appraisal practice requires. None of these methods utilize information or procedures specifically proscribed by the [*Hewitson*] Court. Valuations based on these methods should be appropriate, accurate and fair. . . ." (Vinso & Marcus, *Valuing the Closely-Held Company: The Implications of the Hewitson Case, supra,* p. 6.)

██  We hold, therefore, that the determination of the investment value of closely held shares, as distinguished from their market value, will satisfy the standard of "fair value" as defined and used by section 2000, subdivision (a).

II

THE TRIAL COURT'S RELIANCE SOLELY ON THE
PRICE-EARNINGS RATIO METHOD TO DETERMINE
THE VALUE OF THE CORPORATION WAS IMPROPER

Section 2000, subdivision (c), provides that the court shall appoint three disinterested appraisers to appraise the fair value of the shares, and that the

---

capital structure of the firm. The capitalized value of the net operating income is adjusted by the tax benefits of the debt to yield the value of the firm. The value of the stock is determined by subtracting the market value of the debt from the value of the firm. The determination of the capitalization rate is discussed in a working paper by Vinso (Joseph Vinso, 'The Net Operating Income Approach to Business Valuation,' University of Southern California, working paper, 1984) or Van Horne, *supra.* In essence, the after-tax cost of borrowing and the equity capitalization rate are weighed by the percentage of debt and equity in the capital structure, respectively, to generate the average weighted cost of capital. This method also combines the capitalization of earnings and the use of market prices.

"*Discounted Cash Flow.* This method discounts the cashflow anticipated in future years—typically five—and the capitalized value of future cash flows from that point. The earnings stream is determined and then adjusted by adding non-cash expenses and deducting loan payments and additional working capital requirements. The subsequent cash flow developed is discounted at the equity capitalization rate previously determined. In this way, another method using capitalization of earnings is applied.

"*Market Comparables.* A fifth method of valuing the stock of a closely held company entails use of the values of various ratios developed from public companies in the same or similar industry; it also takes into account the book value of the firm. It is important to note that the prices used here are the fair market prices for these public companies as quoted in organized exchanges or over-the-counter. At no time is an acquisition value to be used—the latter being a value specifically proscribed by the Court in its opinion in the *Hewitson* case. Similarly, it is also important to note that sole reliance on the price-earnings ratio should not occur; price to net worth, price to sales, and other ratios must be included in the analysis." (Vinso & Marcus, *Valuing the Closely-Held Company: The Implications of the Hewitson Case, supra,* pp. 5-6.)

determination of fair value by the appraisers, or a majority of them, when confirmed by the court, "shall be final and conclusive upon all parties." ■ Where, however, the determination of the fair value of the shares by the appraisers, or a majority of them, is erroneous, it is "the duty of the trial court to examine the matter de novo and to fix a proper value. . . ." (*Venables* v. *Credential Ins. Agency, Inc.* (1956) 140 Cal.App.2d 724, 727 [295 P.2d 547].)

At bench, May and Abel filed a report in which the appraisal approach used in estimating the value of the closely held corporation is summarized as follows: "Market Comparison Approach: Wherein the prices paid for common stocks in general or for the stock of companies engaged in similar pursuits are analyzed and compared to the subject company. Price/Earnings ratios are extracted and applied to the subject firm and indications of stock value are resultant. Consideration is thereby afforded the informed investor [on] what [one] is willing to pay for the publicly-traded stock of comparable companies." Moreover, May and Abel expressly assumed that the term "fair value" is equivalent to the concept of fair market value. In addition, the Master in his report to the trial court found that May and Abel used the price-earnings approach to determine the fair value of the shares. Nonetheless, the Master reported that this appraisal method "properly followed the definition for determining the fair value contained in Corporations Code Section 2000. . . ."

■ As previously noted, it is error for a trial court to rely solely on the price-earnings method to determine the value of shares of a closely held corporation. (*In re Marriage of Hewitson, supra,* 142 Cal.App.3d at p. 878.) It is apparent that the methodology used by May and Abel was erroneous in that it relied solely on the price-earnings approach to determine the value of the corporation in order to place a value on the shares of Ronald and Barkley. We conclude, therefore, that the judicial confirmation of an erroneous determination of fair value constitutes prejudicial error, requiring the reversal of the judgment.

III

ELECTION OF PURCHASING PARTY

We are here concerned with providing guidance to the trial court upon the rehearing of this case regarding the question of whether the corporation is, or can be, the purchasing party of the shares of Ronald and Barkley.

Under section 2000, subdivision (a), the corporation is given the first right to purchase the shares of the plaintiffs seeking dissolution of the corporation. In the event the corporation elects not to purchase the shares, the holders of 50 percent or more of the voting shares are given the right to make such purchase. In connection with the intent of section 2000, subdivision (a), the legislative committee comment thereto states: "Frequently, the only source of sufficient cash to avoid dissolution is the corporation. In order that the statutory 'buy-out' procedure establishes a meaningful alternative to termination of the enterprise, this section provides the corporation with the first right to purchase the shares of the moving parties [plaintiffs]." (See 2 Marsh, Cal. Corporation Law, *supra*, § 20.18, pp. 630-631.)

The record shows that the defendants' election specifying the corporation as the purchasing party, which had been filed on February 1, 1984, was denied by the trial court on February 17, 1984, as being untimely and contrary to the parties' stipulation of August 5, 1983. That stipulation, which had been entered into by the plaintiffs and Stabler through their respective attorneys, provided in pertinent part (1) that, when the fair value of the shares is finally determined and adopted by the court, Stabler will pay the total sum due for plaintiffs' shares who, in turn, will deliver their shares to Stabler, and (2) that Stabler will deposit the sum of $100,000 in cash as security and for the purchase of the shares in an account, "in the name of John S. Byrnes, Jr., as trustee for Stabler-4-C's purchase." The record further shows that on September 27, 1983, the trial court issued an order, approving and adopting the stipulation.

It is apparent from the record in this case that Stabler elected to purchase the shares of Ronald and Barkley. This is revealed by his stipulation with the plaintiffs. Moreover, the stipulation provided in part that "[i]f dissolution should occur because of the failure or refusal of [Stabler] to purchase plaintiff[s]' shares then plaintiff[s] shall be entitled to reasonable attorney's fees, appraisal costs and other costs as determined [by] the court." This election of Stabler, however, is only given legal recognition in the event the corporation does not elect to purchase. (Corp. Code, § 2000, subd. (a).) Thus, the question arises whether the corporation is, or may become, the purchasing party under the circumstances.

Section 2000, subdivision (a), provides in pertinent part that "[t]he election of the corporation to purchase may be made by the approval of the outstanding shares (Section 152) excluding shares held by the moving parties." Further, section 152 provides, in part, that " '[a]pproved by (or ap-

proval of) the outstanding shares' means approved by the affirmative vote of a majority of the outstanding shares entitled to vote. Such approval shall include the affirmative vote of a majority of the outstanding shares . . . on the subject matter being voted upon. . . .''

■    Furthermore, section 2000, subdivision (b), provides the procedure to become a purchasing party. That subdivision provides in part that if the purchasing party elects to purchase the shares owned by the plaintiffs, is unable to agree with the plaintiffs upon the fair value of such shares, and gives bond with sufficient security to pay the estimated reasonable expenses of plaintiffs, including attorneys' fees, in the event the purchase is not consummated and liquidation is allowed to occur, the purchasing party may apply to the court to stay the dissolution proceedings and proceed to ascertain and fix the value of the shares. Hence, the corporation is able to become a purchasing party by taking the necessary steps any time prior to the liquidation of the corporation, since there are no time restraints in section 2000. (See, e.g., *Merlino* v. *Fresno Macaroni Mfg. Co.* (1944) 64 Cal.App.2d 462, 465-466 [148 P.2d 884].)

At bench, it is arguable that the defendants' election filed with the court in which the corporation is named as the purchasing party meets the requirements of section 2000, subdivision (a), since Stabler owns 51 percent of the outstanding shares of the corporation. Moreover, it is further arguable that Stabler agreed and did post the required security for the corporation. Our examination of the stipulation reveals that Stabler agreed to deposit $100,000, as security, with the trustee for "Stabler-4-C's purchase."

We conclude, however, that this problem is best handled by the trial court. The trial court has discretion to set aside an election to purchase stock. (*Brodsky* v. *Seaboard Realty Co.* (1962) 206 Cal.App.2d 504, 517 [24 Cal.Rptr. 61].) We find, therefore, that the proper procedure to resolve this question of whether the corporation is, or should be, the purchasing party is through a motion pursuant to Code of Civil Procedure section 473 to set aside the order approving the stipulation of the plaintiffs and Stabler in which Stabler is named the purchasing party. (5 Witkin, Cal. Procedure (2d ed. 1971) § 126, pp. 3702-3703.) In this fashion, the trial court is placed in a position to issue an order "upon such terms as may be just." (Code Civ. Proc., § 473.) We recognize that the stipulation here involves more than just the election of the purchasing party. For example, as part of the stipulation, the plaintiffs agree to resign as directors, officers and employees of the corporation. We therefore leave this question following remand to the sound discretion of the trial court.

Accordingly, the judgment is reversed, and the matter is remanded to the trial court for further proceedings not inconsistent with the views expressed herein. Each party shall bear its own costs on appeal.

Lillie, P. J., and Johnson, J., concurred.