[Civ. No. 54318. Second Dist.. Div. Three. Apr. 3, 1979.]

WESLIE C. BROWN et al., Plaintiffs and Appellants, v.
ALLIED CORRUGATED BOX COMPANY, INC.,
Defendant and Respondent;
GERALD B. BROWN, Intervener and Respondent.

## Counsel

Dill & Showler, Fred H. Dill and Scott Showler for Plaintiffs and Appellants.

No appearance for Defendant and Respondent.

Dunne, Gaston & Foster, Dunne & Gaston, Robert A. Gaston and Robert J. Jagiello for Intervener and Respondent.

## Opinion

**KLEIN, P. J.**—Plaintiffs Weslie C. Brown and Wallis Brown, Jr., appeal from a judgment of the trial court confirming a valuation appraisal of plaintiffs' minority shares in a corporation, which shares were to be purchased by the majority shareholder for the purpose of preventing the involuntary dissolution of the corporation.

### Statement of the Case

Plaintiffs initiated this action in October 1975 by filing a complaint for the involuntary dissolution of defendant Allied Corrugated Box Company, Inc. (Allied), a closely held California corporation engaged in the business of manufacturing corrugated cardboard containers and boxes. At

the time, plaintiffs owned between them 49 of the 100 outstanding shares of Allied. The other 51 shares were owned by plaintiffs' brother and the president of Allied, Gerald B. Brown, the intervener herein.

Plaintiffs' complaint for involuntary dissolution charged intervener Brown with various acts of fraud and unfairness toward them, including inter alia his establishment of a business to compete with Allied's, his failure to cause the corporation to pay dividends, and his taking of excessive salary as president of Allied. After Allied had answered plaintiffs' complaint, intervener Brown filed a complaint in intervention, praying that plaintiffs' request for involuntary dissolution be denied or, in the alternative, that he be permitted to purchase plaintiffs' shares at their fair market value.

After negotiations between the parties failed to produce an agreement as to the value of plaintiffs' shares, intervener Brown noticed a motion to stay the proceedings and to have the court ascertain the value of the minority shares pursuant to the provisions of former Corporations Code section 4658.[1] The motion was granted and, under the authority of former Corporations Code section 4659,[2] the court ordered that the appraisal of

---

[1]Former Corporations Code section 4658 read as follows:

"In any such suit [for involuntary dissolution] the holders of·50 percent or more of the outstanding shares of the corporation may avoid the appointment of a receiver or the dissolution of the corporation by purchasing the shares of stock owned by the plaintiffs at their fair cash value.

"If the holders of 50 percent or more of the outstanding shares of the corporation (a) elect to purchase the shares owned by the plaintiffs, and (b) are unable to agree with the plaintiffs upon the fair cash value of such shares, and (c) give bond with sufficient security to protect the interests and rights of the plaintiffs and to assure to the plaintiffs the payment of the value of their shares, the court shall stay the proceeding and shall proceed to ascertain and fix the value of the shares owned by the plaintiffs."

In connection with the enactment of the new General Corporation Law, section 4658 was repealed (Stats. 1975, ch. 682, § 6, p. 1516, eff. Jan. 1, 1977); its subject matter is now found in Corporations Code section 2000.

[2]Former Corporations Code section 4659: "The court shall appoint three disinterested commissioners to appraise the fair value of the shares owned by the plaintiffs, and shall make an order referring the matter to the commissioners so appointed for the purpose of ascertaining such value. The order shall prescribe the time and manner of producing evidence, if evidence is required.

"The award of the commissioners or of a majority of them, when confirmed by the court, shall be final and conclusive upon all parties, and the court shall enter a decree for the amount of the award against the shareholders electing to purchase and the surety or sureties on the bond. The decree may be enforced in the same manner as other decrees and judgments of the superior court. The decree may be in the alternative, and provide for winding up and dissolution of the corporation unless payment is made for the shares within the time specified by the decree. Any shareholder aggrieved by the action of the court may appeal therefrom.

"The holders of 50 percent or more of shares electing to purchase shall pay to plaintiff shareholders the value of their shares ascertained and decreed pursuant to this section or,

plaintiffs' shares be conducted by three commissioners, with plaintiffs selecting one of the commissioners, intervener Brown selecting the second, and the third being chosen by the first two. In accordance with the court's order, plaintiffs selected an attorney, Robert Carlin, as a commissioner, while intervener Brown nominated a certified public accountant, Michael Trockey; thereafter Carlin and Trockey jointly chose Barbara Kersten, a bank employee whose specialty was loans to small businesses, as the third commissioner.

After making their appraisals, using March 24, 1977, as the valuation date, the three commissioners met but could not reach a consensus as to the value of plaintiffs' shares. But since Trockey and Kersten were in basic agreement, it was decided that they would file a joint report with the court while Carlin would file a separate report. For convenience, Mr. Trockey and Ms. Kersten will hereinafter be referred to jointly as the majority commissioners; Mr. Carlin will be referred to as the minority commissioner.

The reports which were subsequently submitted came to markedly divergent conclusions. According to the majority commissioners' report, plaintiffs' 49 shares had a total value of $27,195. The minority commissioner's report, on the other hand, valued those same shares at $147,596. Plaintiffs responded to this divergence of opinion by making a motion to strike the majority commissioners' report and for a valuation de novo by the court.

At the hearing on plaintiffs' motion, the court initially indicated an intention to appoint a special master to study the reports and reconcile the differences therein. Later in the hearing, however, the court decided to attempt to deal with the problem itself by meeting privately in chambers with first the majority commissioners and then the minority commissioner.[3] After doing so, the court returned to the bench and announced that it had decided to confirm the report of the majority commissioners; plaintiffs' request for a valuation de novo by the court was consequently denied. A decree and judgment were subsequently entered ordering plaintiffs to transfer their shares to intervener Brown in return for payment of $27,195. This appeal followed.

in case of an appeal, as fixed on appeal. On receiving such payment or the tender thereof, the plaintiff shareholders shall transfer their shares to the shareholders electing to purchase."

Section 4659 was repealed at the same time that section 4658 was repealed (Stats. 1975, ch. 682, § 6, p. 1516, eff. Jan. 1, 1977); its subject matter is also now found in Corporations Code section 2000.

[3]The transcript of the court's meetings with the commissioners is part of the record on appeal.

## THE REPORTS

Before turning to plaintiffs' contentions, some discussion of the contents of the commissioners' reports is in order.

Both reports began similarly by providing some background information on Allied, although the majority's was the more detailed in this regard. From the reports, it appears that Allied went into business as a partnership in 1959 and was incorporated in 1964. It is considered to be in a highly competitive industry where its position is insignificant in relation to its larger and more technically advanced competitors. The majority report noted that because Allied employs out-of-date equipment, it must rely to a large extent on personal customer relationships developed over the years to remain competitive.

In addition, both reports devoted a great deal of attention to the question of Allied's potential liability as a defendant in a wrongful death action which was pending when the commissioners made their appraisals. It appears that at one time Allied owned a twin-engined aircraft which it offered for charter on a part-time basis. On October 31, 1973, a temporary substitute for the aircraft crashed on takeoff, killing two of the passengers and injuring others. At the time of the hearing in the instant matter, all of Allied's liability stemming from the accident had been resolved except with respect to an action filed by the widow of a passenger named McGraw. Allied was clearly covered by insurance to the extent of the first $100,000 of the McGraw claim and it was apparently attempting to establish the existence of another $100,000 in coverage. According to the minority commissioner's report, Allied's total personal contribution to the settlement of the other claims arising out of the air crash had been only $15,000. For this reason, and because he felt it unlikely that the McGraw matter would ever come to trial, the minority commissioner concluded that the pendency of the wrongful death action did not materially affect the value of plaintiffs' shares. Conversely, the majority commissioners were of the opinion that Allied's contingent liability in the McGraw suit was a factor which would have to be viewed as decreasing the corporation's net value (and consequently plaintiffs' proportionate share thereof) in an amount ranging anywhere from $40,000 to $165,000.

Both reports also contained an analysis of Allied's earnings over the previous 5.25 years, with almost identical adjustments made to those earnings for extraordinary or nonoperating expenses or losses. The majority commissioners determined that the average earnings over the stated period were $24,103 per year while the minority commissioner

arrived at a figure of $28,238 per year, the difference being predominantly due to a disagreement over whether a profit sharing plan instituted shortly before the trial of the present action should properly be included as an expense of the corporation in determining its earning power.

The remaining contents of the two reports revealed a substantial divergence of opinion between the majority commissioners and the minority commissioner as to how plaintiffs' shares should be valued. Basically, the majority commissioners approached their task by attempting to ascertain what an outsider to the corporation would be willing to pay for plaintiffs' shares in an open market transaction. The minority commissioner, on the other hand, felt that the appropriate measure of value should be what intervener Brown would be willing to pay for those shares.

This difference in appraisal philosophies was reflected in the two approaches the commissioners adopted for evaluating Allied's assets. The majority commissioners felt that the assets should be valued as though the corporation were in liquidation, with each piece of equipment being sold separately or "cherry picked" from the remaining equipment. They concluded that a value for the corporation could best be established on this basis by taking the corporation's net book value,[4] stated to be $170,094, and subtracting therefrom the cost of liquidating the corporation's assets and winding up its business, estimated to be $164,009, leaving a total of $6,085 as shareholders' equity after liquidation. When Allied's potential liability in the McGraw wrongful death action was subtracted from this figure, the corporation's assets were found to have a negative value after liquidation.

The minority commissioner, on the other hand, primarily based his opinion of net asset value upon an appraisal made by Tom Haire, Inc., a dealer in used corrugated box machinery, of Allied's manufacturing equipment as viewed in place and operational (i.e., not in a piecemeal liquidation). After making certain adjustments to the figure obtained from this appraisal, the minority commissioner came to the conclusion that Allied had a tangible net worth of $233,255. A figure for the total fair value of the corporation was then arrived at by adding to this last amount the capitalized value of the corporation's goodwill, said to be $67,962.[5]

---

[4]The majority commissioners believed that the fair market value of Allied's manufacturing equipment was realistically represented in its balance sheet since Allied's accountants had employed the generally accurate straight-line method of depreciation.

[5]The minority commissioner considered the corporation's goodwill to be the excess of net earnings over and above a fair return on the net tangible assets.

The minority commissioner's opinion of the fair cash value of plaintiffs' shares, $147,596, is 49 percent of the sum thereby obtained.

The majority commissioners, having assigned a negative value to Allied's underlying assets, ultimately determined that the corporation's only real value lay in its ability to produce an average of $24,103 per year in income. A capitalized value figure for the corporation of $120,515 was then obtained by multiplying the average earnings by a factor of five. According to the majority commissioners, this multiple factor was chosen in view of the following considerations thought to have a negative impact on the value of the corporation or, more particularly, plaintiffs' proportionate share thereof:

1. Allied was scheduled to lose a favorable lease on its plant some 18 months following the valuation date established by the court;

2. The corporation's debt/equity ratio was very high; .

3. The corporation was employing obsolescent machinery;

4. An outside purchaser of plaintiffs' shares would be obtaining less than a controlling interest in the corporation; and

5. Intervener Brown, with whom the corporation had neither a management contract nor a covenant not to compete, personally controlled at least 40 percent of the corporation's sales.

In addition, the majority commissioners felt that the corporation's capitalized value figure should be reduced by $65,000 to account for Allied's potential liability in the McGraw wrongful death action. The value of plaintiffs' shares was determined to be 49 percent of the reduced figure, or $27,195.

## CONTENTIONS

Plaintiffs make the following contentions: (1) the majority commissioners erred in devaluing plaintiffs' shares because of their noncontrolling status; (2) the majority commissioners improperly considered intervener Brown's personal responsibility for a large bulk of Allied's sales; (3) the majority commissioners in particular, and the minority commissioner to a certain extent, understated the net asset value of the corporation; (4) the majority commissioners erred in reducing the value of plaintiffs' shares because of the pendency of the McGraw wrongful

death action; (5) the trial court erred by not hearing the matter de novo; and (6) the trial court acted improperly by giving one of the majority commissioners certain instructions over the telephone.

## DISCUSSION

For the reasons discussed below, we are convinced that plaintiffs' first two contentions have substantial merit. Since it appears reasonably probable that a result more favorable to plaintiffs would have occurred in the absence of the errors disclosed by these two contentions, we conclude that the cause should be returned to the trial court for further consideration. (*Hrnjak* v. *Graymar, Inc.* (1971) 4 Cal.3d 725, 734 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[6] As such, we will not attempt to discuss in detail all of plaintiffs' remaining contentions, but will instead concentrate upon those issues which are likely to be of concern to the trial court upon remand.

We note preliminarily that intervener Brown urges throughout his brief that the trial court's confirmation of the majority commissioners' report was a factual determination which must be affirmed on appeal because it is supported by substantial evidence. We agree that the court's determination was essentially factual in nature. (See 3 Marsh, Cal. Corp. Law and Practice (1977 West's Cal. Practice Series) § 20.21, pp. 38-39.) The rule requiring factual determinations to be affirmed on appeal if they are supported by substantial evidence, however, does not apply when, as here, the record clearly establishes that improper inferences were drawn at trial from the uncontroverted facts. (*Estate of Hicks* (1970) 3 Cal.App.3d 312, 316-317 [83 Cal.Rptr. 499].)

### 1. *Devaluation for Lack of Control*

Plaintiffs' first contention is that the majority commissioners erred when they devalued plaintiffs' shares because the shares did not represent a controlling interest in the corporation. As a practical matter,

---

[6]We leave the question of how this matter should be handled following remand to the trial court's sound discretion. One possibility is that the same commissioners who appraised the shares in the proceeding below can now take into account our decision, herein and render a revised opinion of value. On the other hand, those commissioners may no longer be available or the trial court may determine that the matter can be most fairly disposed of through the appointment of new commissioners or a special master. The court may even determine that it is capable of making the appropriate adjustment on its own (cf. *Venables* v. *Credential Ins. Agency, Inc.* (1956) 140 Cal.App.2d 724, 726-727 [295 P.2d 547]).

there is no question but that the lack of control inherent in plaintiffs' minority shares would substantially decrease their value if they were placed on the open market. In fact, it appears to be the practice in the area of taxation to devalue minority shares in closely held corporations for just this reason. (See 2 Am.Jur. Proof of Facts 2d 1, 21.)

It has been noted, however, that the rule justifying the devaluation of minority shares in closely held corporations for their lack of control has little validity when the shares are to be purchased by someone who is already in control of the corporation. In such a situation, it can hardly be said that the shares are worth less to the purchaser because they are noncontrolling. (See Comment, *Dissolution Under the California Corporations Code: A Remedy for Minority Shareholders* (1975) 22 UCLA L.Rev. 595, 611 & fn. 62.)

Further indication that minority shares should not be reduced for their lack of control under circumstances such as those presented here appears from an examination of the statutory scheme which underlay the instant proceedings. Plaintiffs' complaint for the involuntary dissolution of Allied charged the controlling shareholder, intervener Brown, with various acts of misconduct generally coming within the ambit of former Corporations Code section 4651, subdivision (e). That subdivision permitted the involuntary dissolution of a corporation upon a showing that "[t]he directors or those in control of the corporation have been guilty of persistent fraud, mismanagement, or abuse of authority, or persistent unfairness toward minority shareholders . . . ." (§ 4651 was repealed by Stats. 1975, ch. 682, § 6, p. 1516, eff. Jan. 1, 1977; see now Corp. Code, § 1800.) Had plaintiffs been permitted to prove their case and had the corporation then been dissolved, it is clear that upon distribution of the dissolution proceeds each of the shareholders would have been entitled to the exact same amount per share, with no consideration being given to whether the shares had been controlling or noncontrolling.[7]

Under the valuation approach adopted by the majority commissioners and confirmed by the trial court, however, a controlling shareholder, especially an unscrupulous one, could avoid the proportionate distribution which would follow from an involuntary dissolution simply by invoking the buy-out provisions of former Corporations Code sections

---

[7]It has been noted that "since the jurisdiction of the court in an involuntary dissolution action includes determination of how the assets will be distributed, the minority shareholder is substantially protected from inequitable distribution at the hands of the majority." (Comment, *Dissolution Under the California Corporations Code: A Remedy for Minority Shareholders, supra,* 22 UCLA L.Rev. 595, 609, fn. omitted.)

4658 (fn. 1, *ante*) and 4659 (fn. 2, *ante*). According to that approach, the minority shares would then have to be valued in relation to what they would bring in the open market, with an appropriate reduction for the fact that they do not give their purchaser control of the corporation. Further, if, as was apparently the case here, the controlling shareholder has been using his position to insure that no benefits, such as dividends or employment, ever accrue to the owners of the minority shares, then an argument could be made that the value of the minority shares should be reduced even further, perhaps to zero. Thus, the very misconduct and unfairness which provoked the minority shareholders to seek involuntary dissolution could, in this manner, be used to further oppress them. This, the statutory scheme before us cannot be read as condoning. Rather, the statutes suggest that a minority shareholder who brings an action for the involuntary dissolution of a corporation should not, by virtue of the controlling shareholder's invocation of the buy-out remedy, receive less than he would have received had the dissolution been allowed to proceed. The majority commissioners' decision here to devalue plaintiffs' shares for their lack of control was in direct conflict with this principle.[8]

### 2. *Intervener Brown's Personal Control Over Sales*

In listing the factors which they felt negatively influenced the value of plaintiffs' shares, the majority commissioners stated the following in their report: "There is no management contract or covenant not to compete available in the event of decision of the principal salesman to leave the company and start a competitive business. The key salesman controls at least 40% of the company sales on personal relationship basis." Although he is not named, there appears to be no dispute that the "principal" or "key" salesman referred to is intervener Brown.

We believe that plaintiffs are correct in asserting that intervener Brown's personal control over a large portion of Allied's sales was

---

[8]Although not necessary to our decision, we note that it is the opinion of many legal commentators that any premium over market value paid to a controlling shareholder for the purchase of his shares should be treated as though it were a corporate asset. (See 1 Marsh, Cal. Corp. Law and Practice, *supra*, § 10.33, p. 626; see also Annot. (1971) 38 A.L.R.3d 738, discussing cases dealing with this issue.) Permitting intervener Brown to purchase plaintiffs' shares at a reduced value because of their minority status would be, in effect, to grant him a premium for his controlling interest. The extent to which California has embraced the views of the commentators on this point, however, is far from clear. (See *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 111, 117 [81 Cal.Rptr. 592, 460 P.2d 464]; *Brown v. Halbert* (1969) 271 Cal.App.2d 252, 269-272 [76 Cal.Rptr. 781, 38 A.L.R.3d 718]; see also 1 Marsh, *supra*, at p. 627.)

improperly considered by the majority commissioners. In discussing intervener Brown's ability to personally control a large portion of Allied's sales, the majority commissioners were, in effect, attempting to attribute the corporation's goodwill directly to intervener Brown in his individual capacity. This was made clear by the majority commissioners in their in-chambers conference with the trial court when one of them stated: "In essence, we analyzed the company on the basis of what is goodwill. Goodwill is Mr. Jerry Brown [intervener]. A great deal of what he has to offer his customers is himself." It is well established, however, that "[t]he goodwill of a business conducted by a corporation is the property of the corporation alone . . . ." (*Dodge Stationery Co.* v. *Dodge* (1904) 145 Cal. 380, 387 [78 P. 879]; see also *Golden State Linen Service, Inc.* v. *Vidalin* (1977) 69 Cal.App.3d 1, 10 [137 Cal.Rptr. 807]; 38 Am.Jur.2d, Good Will, § 11, p. 919.) The majority commissioners contravened this rule by treating the goodwill as though it belonged exclusively to intervener Brown.

Moreover, in his capacity as the dominant or controlling shareholder of Allied, intervener Brown was charged with the duties of a fiduciary. (*Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 108-109; *Remillard Brick Co.* v. *Remillard-Dandini Co.* (1952) 109 Cal.App.2d 405, 420-421 [241 P.2d 66].) As such, he was not entitled to use his dominant position to control the corporate activities to benefit himself alone or in a way detrimental to plaintiffs, the minority; any use to which he put the corporation *had to benefit all shareholders proportionately. (Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d at p. 108.) By focusing on intervener Brown's ability to leave the corporation and possibly take his customers with him, the majority commissioners ignored the fact that in developing a clientele through his use and control of the corporation's assets, Brown was deemed to be acting for the benefit of all the shareholders, not just himself. Plaintiffs were entitled here to their proportionate share of the entire corporation, including whatever goodwill intervener Brown had established. Any implied threat by Brown to leave the corporation and destroy its goodwill should consequently not have been considered.

## 3. *Valuation of Allied's Assets*

As new considerations upon remand may have a significant impact upon plaintiffs' contention concerning the manner in which the net asset value of the corporation was determined by the commissioners, we will comment only upon the portion of plaintiffs' argument directed at

whether it was proper for the majority commissioners to assume a piecemeal sale of the assets.

We note initially that the statutory scheme which governed the instant proceedings provided little assistance to the court, the commissioners, or the parties with regard to how plaintiffs' shares should be valued. Former Corporations Code section 4658 (fn. 1, *ante*) stated only that plaintiffs should be awarded the "fair cash value" of their shares, while former section 4659 of that code (fn. 2, *ante*) referred merely to the "fair value of the shares." Appreciably more detailed instructions governing the appraisal process would, of course, have been quite impracticable since the valuation of stock, especially that of a closely held corporation, requires a factual determination which must take into account numerous factors and contingencies. (See generally 2 Am.Jur. Proof of Facts 2d 1, 11-14, discussing the valuation of a closely held stock for purposes of taxation.)

One of the many factors which was considered by all of the commissioners here was the net worth of Allied's assets. However, as discussed above, the majority commissioners and the minority commissioner came to highly divergent conclusions on this point, primarily due to the fact that the majority commissioners felt the assets should be valued as though they were being sold piecemeal while the minority commissioner appraised them as if they were to be sold as part of a going concern.

In light of the factual nature of the determination to be made, neither of the two approaches employed by the commissioners can be said to have been invalid per se. As was touched upon previously, the object of the appraisal proceedings below should essentially have been to award plaintiffs what they would have received had their involuntary dissolution action been allowed to proceed to a successful conclusion. (See 3 Marsh, Cal. Corp. Law and Practice, *supra*, §.20.22, p. 39.) And had the corporation been dissolved, its liquidation might very well have been accomplished by a piecemeal sale of its assets. On the other hand, it has been noted that "a liquidation does not necessarily contemplate that the assets will be sold piecemeal and the goodwill of the business sacrificed by a termination of the business." (3 Marsh, *supra*, at p. 40.)[9] In fact, the present version of the buy-out statute expressly provides for an appraisal

---

[9]This observation disposes of intervener Brown's argument to the effect that plaintiffs somehow became estopped to deny that their shares should be valued as though the corporation's assets were being liquidated piecemeal when they alleged in their verified answer to the complaint in intervention that the value of the outstanding stock would not suffer if the court were to dissolve the corporation.

in which "[t]he fair value shall be determined on the basis of the liquidation value but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." (Corp. Code, § 2000, subd. (a).)

It would appear from an inspection of the entire record in the case at bench, including the transcript of the in-chambers proceedings, that the majority commissioners did in fact consider the possibility of valuing Allied's assets as though they were to be sold as part of a going concern.[10] Such an approach to valuation was eventually rejected by the majority commissioners, however, apparently because they felt the impending loss of Allied's plant leasehold and its use of obsolescent equipment made a going concern liquidation unlikely. The minority commissioner obviously reached the opposite conclusion. It is thus evident that the divergence in the two approaches adopted by the commissioners for the valuation of the corporation's assets was essentially due to a factual dispute, the resolution of which was the trial court's responsibility.

### 4. *Impact of the McGraw Wrongful Death Action*

We need say very little concerning plaintiffs' contention that the majority commissioners erred in reducing the value of the subject shares because of the pendency of the McGraw wrongful death action. In a petition for leave to produce additional evidence in this court, which petition was denied, plaintiffs indicated that after the proceedings below were completed the McGraw claim was settled for an amount within the policy limits of Allied's insurance. Furthermore, although the trial court's order staying the proceedings and appointing the commissioners provided that plaintiffs' shares should be valued as of March 24, 1977, it was also specifically provided therein that the value of the shares should not be reduced because of the McGraw suit if that matter was settled within the limits of the corporation's insurance coverage prior to the court's confirmation of the commissioners' appraisal. Since our decision here will overturn the trial court's confirmation of the appraisal award, it would be

---

[10] In particular, the record discloses that the majority commissioners gave a great deal of consideration to the appraisal made by Tom Haire, Inc., discussed above, which was of the corporation's machinery on an installed basis and operating as a unit.

It might be noted here that an appraisal performed by the Milton J. Wershaw Co. was also considered by the majority commissioners. This appraisal was described in the majority report as being "on an auction basis" and reflected a liquidation value for the corporation of $150,000. The record, however, is somewhat unclear as to why this appraisal was ultimately rejected by the majority commissioners.

appropriate for that court upon remand to consider the recent developments in the McGraw action.

## 5. *Hearing De Novo*

We find absolutely no merit in plaintiffs' contention that a trial court faced with highly conflicting appraisal reports is obligated to make a de novo determination of value. Plaintiffs' authority for this proposition, *Venables* v. *Credential Ins. Agency, Inc., supra,* 140 Cal.App.2d 724, says no such thing. Rather, the court in that case merely held that *if the trial court becomes convinced that an appraisal award is erroneous,* then it becomes the duty of the court to examine the matter de novo. *(Id.,* at p. 727.) ■ Thus it appears that when, as in the case at bench, a trial court becomes convinced that one of two highly discordant appraisal reports accurately reflects the value of the shares in question, it may confirm that report without investigating the matter anew. (See also 3 Marsh, Cal. Corp. Law and Practice, *supra,* § 20.21, p. 38.)

## 6. *Instructions to the Commissioners*

During the course of the in-chambers proceedings, majority commissioner Trockey divulged for the first time that he had spoken personally with the trial court over the telephone on two occasions prior to the hearing on the appraisal reports. On the first such occasion, Trockey apparently asked the court how the commissioners should value the corporation and the court responded, "under the probate law and the bankruptcy law." The second conversation between the court and Mr. Trockey appears to have merely involved the arrangement of the meeting between the three commissioners.

As the cause is to be returned to the trial court for further proceedings, we need not comment extensively upon plaintiffs' contention that the trial court committed prejudicial error in conferring with Mr. Trockey in this fashion prior to the hearing. We do note, however, that in the court's order appointing the commissioners the following provision appears: "In the event the Commissioners are unable to agree upon the manner in which to proceed with their duties, they shall petition the court for instruction." If commissioners continue to be involved in the proceedings after remand (see fn. 6, *ante*), it should be made clear by the trial court how this provision is to be complied with so as to avoid any appearance of impropriety.

## DISPOSITION

The judgment confirming the report of the majority commissioners and ordering transfer of plaintiffs' shares to intervener Brown upon payment of $27,195 is reversed and the cause remanded for further proceedings not inconsistent with the views expressed herein.

Allport, J., and Potter, J., concurred.

The petition of intervener and respondent for a hearing by the Supreme Court was denied June 27, 1979.