[No. A095456. First Dist., Div. Two. Jan. 23, 2002.]

BRADLEY C. MART, Plaintiff and Appellant, v.
LELAND SEVERSON, Defendant and Respondent.

COUNSEL

Sheppard, Mullin, Richter & Hampton, Robert J. Stumpf, Jr., Kevin D. Reese, Julie A. Wilkinson; Law Offices of Robert D. Carrow and Robert D. Carrow for Plaintiff and Appellant.

Horvitz & Levy, Jon B. Eisenberg; William N. Hancock; Grillo & Stevens, Evelio M. Grillo and Holly M. Baldwin for Defendant and Respondent.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

Bradley C. Mart (Mart) and Leland Severson (Severson) are the sole shareholders of Bay World Trading Ltd. (Bay World). Mart appeals from a decree which provides that Bay World will be dissolved unless Bay World and/or Severson elects to buy out Mart's shares in the corporation. Mart argues that the superior court's determination of the "fair value" of his Bay World shares was erroneous as a matter of law. We agree and, therefore, reverse the trial court's order.

## II.  Corporations Code Section 2000

This appeal is from a special proceeding conducted pursuant to section 2000 of the Corporations Code[1] and is expressly authorized by that statute. (§ 2000, subd. (c).) Therefore, we begin by reviewing the statutory procedure.

The present case involves a voluntary dissolution proceeding. Shareholders of a corporation who represent 50 percent or more of the voting power may elect to wind up and dissolve that corporation by initiating a voluntary dissolution proceeding. (§§ 1900-1903.) The special proceeding established by section 2000 "enable[s] a 50 percent shareholder to avoid dissolution of the corporation by purchasing the stock of the shareholder(s) seeking to dissolve the corporation." (*Abrams v. Abrams-Rubaloff & Associates, Inc.* (1980) 114 Cal.App.3d 240, 247 [170 Cal.Rptr. 656] (*Abrams*).) This procedure, which also applies in involuntary proceedings, reflects the Legislature's "interest [in] preserving the corporate enterprise as a going concern if desired by the majority or by the other 50% owners" and is intended to be a "meaningful alternative to termination of the enterprise." (Legis. Com. com., 23E West's Ann. Corp. Code, § 2000 (1990 ed.) pp. 514, 516-517.)

Section 2000 states that, when a voluntary proceeding has been initiated by the vote of shareholders representing only 50 percent of the voting power (the moving parties), the corporation or the holders of the other 50 percent of the voting power (the purchasing parties) "may avoid the dissolution of the corporation and the appointment of any receiver by purchasing for cash the shares owned by the [moving parties] at their fair value." (§ 2000, subd. (a).)

"Fair value" is defined in section 2000 as "the liquidation value as of the valuation date[2] but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." (§ 2000, subd. (a).) ▮ In other words, section 2000 expressly requires that the going concern value of the corporation be reflected in the fair value price. The reason for this requirement is that "a liquidation does not necessarily contemplate that the assets will be sold piecemeal and the goodwill of the business sacrificed by a termination of the business." (2 Marsh et al., Cal. Corporation Law (4th ed. 2001 supp.) § 21.08[C], p. 21-45.) It may be possible to sell the entire business as a going concern in liquidation. "If that is true, then the moving parties should be entitled to a value which takes into account that possibility,

---

[1]Unless otherwise indicated, all statutory references are to the Corporations Code.

[2]The valuation date in the case of a voluntary dissolution proceeding is the date upon which that proceeding was initiated unless the court, for good cause, designates some other date. (§ 2000, subd. (f).)

since such a sale of the entire business as a going concern could be made in the liquidation if the dissolution were permitted to proceed." (*Ibid.*)

Anticipating that opposing parties in a dissolution proceeding may not agree as to the "fair value" of the moving parties' shares, the Legislature established a procedure for determining that fair value. If the purchasing parties elect to purchase the shares of the moving parties but the parties cannot agree upon the fair value of those shares, the purchasing parties may apply to the superior court to stay the dissolution proceeding and "ascertain and fix the fair value of the shares owned by the moving parties." (§ 2000, subd. (b).) In such an event, the court "shall appoint three disinterested appraisers to appraise the fair value of the shares owned by the moving parties, and shall make an order referring the matter to the appraisers so appointed for the purpose of ascertaining such value. . . . The award of the appraisers or a majority of them, when confirmed by the court, shall be final and conclusive upon all parties." (§ 2000, subd. (c).)

The court must then "enter a decree which shall provide in the alternative for winding up and dissolution of the corporation unless payment is made for the shares within the time specified by the decree." (§ 2000, subd. (c).) "If the purchasing parties desire to prevent the winding up and dissolution, they shall pay to the moving parties the value of their shares ascertained and decreed" within the time specified in the decree or fixed on appeal. Upon receiving such payment, "the moving parties shall transfer their shares to the purchasing parties." (§ 2000, subd. (d).) In other words, once the fair value is set pursuant to section 2000, the purchasing parties have the right, but no corresponding obligation, to purchase the moving parties' shares at the fair value price. (§ 2000, subd. (d).)

With this statutory framework in mind, we turn to the facts which led to this appeal.

### III. Statement of Facts and Procedural Background

Bay World is a California corporation that sells and exports meat and meat by-products. Mart and Severson are each 50 percent shareholders and are both directors of the corporation.

On February 24, 2000, Mart signed a "Written Consent of Shareholders to the Election to Wind Up and Dissolve" Bay World. Mart delivered this written consent to Severson the following day at a meeting of Bay World's board of directors. That same day, Severson gave Mart notice of his intent to

sue Mart for breach of fiduciary duty because Mart was allegedly attempting to establish a business that would compete with Bay World.[3]

On February 28, 2000, Mart filed a petition in the superior court pursuant to section 1904 requesting court supervision of the voluntary winding up of Bay World. According to the petition, court supervision was necessary because the shareholders were "divided into factions and the board of directors [was] deadlocked with regard to management and direction of the corporation." The directors could not agree on a plan of dissolution or liquidation and internal dissention threatened to substantially delay completion of the dissolution process absent court assistance.

On March 16, 2000, Severson exercised his right under section 2000 to have Bay World purchase Mart's shares at their "fair value" in order to avoid corporate dissolution. On April 6, 2000, the Honorable Ronald Quidachay stayed dissolution of Bay World and initiated the process of selecting a panel of three disinterested appraisers to value Mart's shares.[4] Thereafter, the court appointed one appraiser selected by Mart and one selected by Severson and then ordered those two to select a third who was then confirmed by the court. The three appraisers, KPMG Consulting, LLC, Sierra Capital Advisors, LLC, and Law and Economics Consulting Group, LLC, submitted a joint report dated November 30, 2000 (November 30 report). According to the November 30 report, the appraisers worked together to determine the fair value of Bay World, all understood their study was being made pursuant to section 2000, and the opinions expressed in the report were the consensus opinions of all three appraisers.

The appraisers defined fair value as it is defined in section 2000, i.e., "[t]he liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." The appraisers expressly stated that "we believe the Company would be sold as a going concern." Therefore, they concluded that a "cost approach" valuation method, which focuses exclusively on the assets and liabilities of the corporation, was not applicable. Instead, the appraisers employed two alternate valuation methods, the "income approach" and the "market approach" because these approaches "provide a more realistic indication of what [Bay World] would be sold for as a going concern . . . ."

---

[3]On February 29, 2000, Severson filed an individual and derivative lawsuit against Mart. Severson alleged causes of action for breach of fiduciary duty and wrongful dissolution and sought to remove Mart as a director of Bay World. On November 14, 2001, Severson filed a request for judicial notice in this court. Severson asks us to take notice of court records in his action against Mart. The documents Severson asks us to judicially notice are not relevant to the issues on appeal; his request for judicial notice is thus denied.

[4]The superior court also appointed a provisional director to resolve any deadlock on the board of directors.

The November 30 report sets forth the following ultimate conclusion: "Based on our analysis, which relied in part on information and data supplied by the Company, our conclusion of the fair value of 100 percent of the common stock of Bay World . . . as of February 25, 2000 is: [¶] $5.6 MILLION DOLLARS [¶] $5,600,000."

On December 5, 2000, Severson filed a motion to remand the November 30 report. Severson argued the appraisers' valuation methods were erroneous because they resulted in a calculation of Bay World's fair market sale value rather than' its liquidation value as required by California law. A hearing on Severson's motion was held on January 4, 2001, before the Honorable A. James Robertson. Initially, the court expressed the opinion that the appraisers' analysis was proper. However, Severson's counsel maintained that the report was ambiguous as to whether the appraisers had calculated a liquidation value. Ultimately, the court decided to request clarification from the appraisers.

On January 9, 2001, the court filed an order instructing the appraisers to submit a supplemental letter further explaining their November 30 valuation of Bay World. The order inquired whether the appraisers calculated the liquidation value of Bay World or its sale value as a going concern in liquidation. The term "liquidation value" was not defined in the order. The order set forth several additional questions, including (1) whether the appraisers adjusted their valuation to reflect a forced sale under court supervision, (2) how the valuation differed from a standard fair market valuation, and (3) whether the appraisers considered threatened litigation against the corporation. Finally, the appraisers were asked whether they considered the effect of potential competition when calculating Bay World's value and specifically whether they "assumed a covenant not to compete on the part of the shareholders and directors in determining fair value."

On January 12, 2001, the appraisers sent a detailed (and again unanimous) letter to the court responding to the inquiries in the January 9 order (January 12 letter). The appraisers equated the "liquidation value" method referred to in the court's order to the "cost approach" which, as was stated in the November 30 report, was not applicable. Under this approach, "the fixed and other tangible assets of the Company are sold piecemeal, the liabilities are retired, and the remaining equity after expenses, if any, is distributed to the shareholders." According to the appraisers, this approach is used to value companies that are insolvent or incapable of earning a return adequate to support the value of the assets. Each of the appraisers considered the piecemeal liquidation value of Bay World, but all three independently concluded that value was irrelevant in light of Bay World's historical earnings record and future earnings capability.

The appraisers repeated their unanimous opinion that Bay World "would be sold as a going concern in liquidation." They explained that, as of the valuation date, a seller simply would not accept the piecemeal liquidation value as valid because it "would not reflect the value of the intangible assets of the business, such as the brand name and client relationships, which is best reflected through going concern, earnings-based approaches." The appraisers advised that they did interpret "fair value" to mean the price that would be received for the corporation in a liquidation sale under court supervision, assuming a "tainted" sale environment and a "forced seller." The appraisers took these liquidation-related factors into account when conducting their analysis.

The appraisers also advised the court that they had considered whether actual or threatened litigation against Bay World affected its value, but concluded it did not. The appraisers expressly found that Severson's lawsuit against Mart did not affect Bay World's value as of the valuation date for several reasons, including the facts that the litigation was "primarily personal in nature" and that Bay World's "operations had not been materially impacted by Mr. Mart's activities previous to the Date of Value."

Finally, the appraisers explained that they did not adjust their valuation to account for potential competition on the part of the shareholders. Relying on California authority construing section 2000, the appraisers "assumed hypothetical covenants not to compete would be executed by both shareholders and key employees in a sale of the Company on the Date of Value." The appraisers also explained that, although they had not attempted to estimate the impact on value if such agreements were not signed, it was their opinion that "a sale of the Company as a going concern would be very difficult, if not impossible, in such a circumstance."

A continued hearing was scheduled for February 9, 2001. Prior to that hearing, the court issued a tentative ruling requiring Mart to submit a noncompetition agreement as a condition for the court's approval of the appraisers' valuation of Bay World. At the hearing, the court continued the matter to give Mart time to prepare such an agreement.

The hearing was continued to February 27, 2001. At the hearing, the court expressed the view that Bay World could be valued as a going concern business only if Mart executed a valid covenant not to compete with Bay World. The court also expressed concern that such a covenant was not in place as of the valuation date. Mart's counsel produced a noncompetition

agreement that Mart had signed. Severson's counsel objected to the agreement as untimely. The court concluded that the proffered agreement was too narrow but suggested that Mart attempt to draft an alternative agreement that would afford Bay World more protection. In the meantime, the court would request that the appraisers calculate a piecemeal liquidation value for Bay World.

In an order filed February 28, 2001, the court remanded the appraisers' November 30 report and instructed the appraisers to calculate the piecemeal liquidation value of Bay World as of February 25, 2000. The order also granted Mart leave to submit an alternative covenant not to compete, which the court would consider at the next hearing.

On March 19, 2001, the appraisers submitted their "Liquidation Value Analysis" which set forth the following conclusion: "Based on our study, our opinion of the liquidation value of Bay World . . . as of the Valuation Date is: [¶] ONE MILLION FOUR HUNDRED EIGHTY THOUSAND DOLLARS [¶] $1,480,000."

At a hearing on April 4, 2001, the court concluded that "the 1.48 million liquidation value was to be used rather than the greater sum." The court found that a revised noncompete agreement Mart had submitted prior to the hearing was not "fully effective" and did not give an "absolute guarantee" that Mart would not compete with Bay World. The court found that, even if such a guarantee could be provided now, it was too late because such an agreement did not exist as of the valuation date.

On April 17, 2001, the court filed a "Decree and Judgment Winding Up and Dissolving Bay World If Confirmed Value of Shares Is Not Paid And For Award of Expenses" (April 17 decree). The April 17 decree set forth the procedure pursuant to which Bay World and/or Severson could exercise their option to purchase Mart's shares of Bay World for a payment of $740,000, plus interest in order to prevent dissolution of the corporation. Among other things, the April 17 decree stated that "the appraisers March 19, 2001 supplementary report determining the piecemeal liquidation value of Bay World Trading to be $1,480,000 as of the February 25, 2000 valuation date is confirmed and is final and conclusive upon all parties." The decree further stated: "The Court finds that the $5,600,000 award was premised upon the execution of an effective covenant not to compete by the parties and that no such covenant has been submitted to the Court. As the Court has doubts that any effective covenant not to compete could ever be executed, the Court

adopts the piecemeal liquidation value determined by the appraisers in their March 19, 2001 supplementary report."

On June 21, 2001, Mart filed a notice of appeal.[5]

## IV. Discussion

Mart contends the April 17 decree must be reversed because the trial court's determination of the "fair value" of Bay World shares was erroneous as a matter of law. The factual aspects of the court's fair value determination are reviewed under the substantial evidence standard. (See, e.g., *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].) However, the superior court's interpretation of the statutory standard set forth in section 2000 is subject to de novo review on appeal. (See, e.g., *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2000) ¶ 8:4, p. 8-2.)

The trial court found that the fair value of Bay World's shares was its piecemeal liquidation value, i.e., $1.48 million. This conclusion is not supported by substantial evidence and resulted from an erroneous application of the section 2000 definition of "fair value."

The overwhelming evidence in this record indicates that the fair value of 100 percent of Bay World's shares as of the valuation date is $5.6 million. That was the unanimous conclusion of all three disinterested appraisers and that conclusion is supported by the appraisers' November 30 report and their January 12 letter to the court clarifying that report. Indeed, we find no contrary evidence in the appellate record. The trial court's conclusion that Bay World's fair value was $1.48 million is not supported by the evidence. The appraisers all agreed that this figure reflects Bay World's *piecemeal liquidation value*, but that value is not equivalent to its fair value because Bay World could have been sold as a going concern in liquidation on the valuation date.

The trial court rejected the appraisers' fair value determination of $5.6 million because it found that determination was "premised upon the execution of an effective covenant not to compete by the parties" and no such

---

[5]Mart appealed both the April 17 decree and a June 18, 2001, order by a different judge of the same court denying Mart's motion for an order requiring Bay World to distribute earnings to its shareholders. Mart has conceded both in his reply brief and at oral argument before this court that the June 18 order is not appealable at this time. Therefore, the portion of Mart's appeal pertaining to the June 18 order is dismissed.

covenant had been or could be executed in this case. It is unclear to us whether the trial court concluded that (a) the appraisers made the execution of an effective covenant not to compete a precondition for their recommendation or (b) such a covenant was a legal prerequisite for finding that a corporation could be sold as a going concern in liquidation. In either case, the court was incorrect.

The appraisers did not condition their conclusions upon Mart's execution of a covenant not to compete. Rather, they concluded that Bay World could be sold as a going concern in liquidation and then calculated a monetary fair value by considering a hypothetical sale of Bay World on the valuation date. A reasonable and expected term of such a sale would be a sellers' covenant not to compete with the corporation after the sale. Therefore, the appraisers "assumed hypothetical covenants not to compete would be executed by both shareholders and key employees in a sale of the Company on the Date of Value." The appraisers did not consider whether Mart had already executed a covenant not to compete nor did they require that such a covenant be executed. Indeed, Mart was not the seller in the hypothetical they considered. The question the appraisers answered was whether the *entire corporation* could have been sold as a going concern in liquidation as of the valuation date, not whether Mart could have sold *his share* of the corporation to Severson under those circumstances.

The appraisers applied section 2000 properly by assuming that a hypothetical willing seller of Bay World would execute a covenant not to compete with the corporation after the sale. Section 2000 requires that the fair value determination reflect a corporation's value as a going concern if a sale of the corporation as a going concern in liquidation is possible. (§ 2000, subd. (a) ["fair value shall be determined on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation"].) Thus, section 2000 necessarily requires that the appraisers contemplate a hypothetical sale scenario: *a sale of the entire corporation, in a liquidation setting, on the valuation date.* Further, since the corporation will almost always be closely held, "there will be no actual market value or any actual cash sales by which the market value could be determined. Therefore, the value to be determined must necessarily be a constructed or hypothetical market value at which the hypothetical willing seller would sell and the hypothetical willing buyer would purchase." (2 Marsh et al. Cal. Corporation Law, *supra*, § 21.08[C], p. 21-45.)

California case law construing section 2000 approves the use of a hypothetical sale model, like the one employed by the appraisers in this case, to

calculate the fair value of a corporation that can be sold as a going concern in liquidation. (*Abrams, supra,* 114 Cal.App.3d at pp., 248-249.) In *Abrams,* the court held that appraisers who conducted a section 2000 fair value determination acted properly by assuming that the owners of the corporation would have agreed not to compete with the corporation after it was sold as a going concern in liquidation. (*Abrams, supra,* 114 Cal.App.3d 240.) The court reasoned that "[s]ection 2000 states that the appraisers should consider the 'possibility of a sale as a going concern in a liquidation.' Under the statute, the appraisers are not only entitled, but are required, to consider the manner in which the parties to such a hypothetical sale are most likely to maximize their return." (*Id.* at p. 249.)

Case law also confirms that the potential threat of future competition by the current shareholders should not affect the fair value analysis. (*Brown v. Allied Corrugated Box. Co.* (1979) 91 Cal.App.3d 477 [154 Cal.Rptr. 170] (*Brown*).) *Brown* involved a fair value determination conducted pursuant to former section 4659, the predecessor statute to section 2000. (*Brown, supra,* 91 Cal.App.3d at p. 480, fn. 2.) The *Brown* court found that the appraisers who conducted that determination erred by considering the negative impact of the fact that the shareholder who was primarily responsible for developing the corporation's goodwill had not entered into a noncompete agreement with the corporation. (*Id.* at pp. 487-488.) The *Brown* court reasoned that the goodwill of a business is the indivisible property of the corporation and the value of that asset must be reflected in the fair value determination. In other words, discounting the value of the corporation because of the threat of future competition by one of its shareholders unfairly deprives the moving party of the true value of his stock.

In the present case, the trial court misinterpreted section 2000. That statute contains a procedure for establishing a fair value price for the moving party's stock. However, the section does not govern or even address covenants not to compete or any other term of the sale pursuant to which the purchasing party can buy out the shares of the moving party. Nor does it authorize the trial court to dictate any of the terms of that sale *other than price.* In the present case, the trial court required that Mart submit executed covenants not to compete and then it found those proposed agreements were inadequate. Section 2000 does not give the trial court authority to require a party to execute a covenant not to compete or to evaluate the validity of such a covenant. The trial court should not have become involved in negotiations pertaining to that sales term.

Ignoring the flaws in the trial court's reasoning, Severson claims the April 17 decree must be affirmed because substantial evidence supports the finding that Bay World could not have been sold as a going concern in

liquidation on the date of value. But the trial court made no such finding.[6] Rather, it erroneously concluded that Mart had to execute a covenant not to compete in order to obtain fair value for his Bay World shares. As explained above, neither the appraisers nor section 2000 imposed any such precondition.

Furthermore, the "substantial evidence" upon which Severson relies is his subjective version of the dispute between himself and Mart which culminated in these dissolution proceedings including, in particular, evidence that Mart allegedly refused to agree not to compete with Bay World prior to the institution of the voluntary dissolution proceeding. The trial court did not rely on or even allude to this evidence (which Mart objected to) as supporting its fair value determination. Nor should it have done so because such evidence is not relevant to the fair value analysis.

Section 2000 establishes an objective process for valuing a corporation after dissolution proceedings have commenced. The fair value is the liquidation value. But liquidation value can mean going concern value if the corporation could be sold as a going concern in liquidation. Thus, the hypothetical question posed by section 2000 is whether the entire corporation could have been sold as a going concern in liquidation on the valuation date. To answer that question, the appraisers considered hypothetical reasonable sellers, hypothetical reasonable buyers, and a hypothetical forced sale liquidation environment. Evidence that Mart would not actually give Severson a covenant not to compete prior to the valuation date is simply not relevant to the hypothetical scenario the appraisers considered.

When determining fair value under section 2000, the only relevant issue with respect to Mart's allegedly competitive activities was whether they affected the value of Bay World *as of the date of value*. If Mart's activities had destroyed the value of Bay World or prevented it from being sold as a going concern in liquidation, then the court should have concluded that the piecemeal value was the fair value. But the trial court made no findings to support such a conclusion. Nor did the court reject or even question the independent appraisers' express conclusion that the conflicts between Severson and Mart, including Mart's activities prior to the valuation date, did not diminish Bay World's value. In their January 12 letter, the appraisers explained why Mart's alleged activities did not affect Bay World's value.

---

[6]Mart has filed a motion to augment the appellate record to include correspondence between these parties and the trial court regarding the form and content of the April 17 decree. Mart argues these documents are relevant to rebut Severson's contention that the trial court made factual findings supportive of its fair value conclusion. Mart's motion to augment is denied. The record before us already demonstrates that the trial court did not make the factual findings Severson now claims were made.

The dispute between Mart and Severson was "primarily personal in nature" and, in any event, Bay World's "operations had not been materially impacted by Mr. Mart's activities previous to the Date of Value."

Severson contends that *Abrams, supra,* 114 Cal.App.3d 240, does not require that appraisers assume a hypothetical seller's covenant not to compete in every section 2000 case and that the trial court "properly found that it would have been error to impute a hypothetical covenant not to compete in fixing 'fair value' in this case." Again, the trial court made no such finding. Nor did it even address *Abrams,* a case that expressly supports the use of a hypothetical sale model in order to conduct a section 2000 fair value analysis. Rather, the court erroneously concluded that Mart's actual covenant not to compete was required by either the appraisers or section 2000.

Furthermore, when making a section 2000 fair value determination, appraisers should always assume a hypothetical seller's covenant not to compete just as they should assume that the parties to the hypothetical sale will negotiate the other requisite terms to a sales agreement. Indeed, without these assumptions, it would be impossible to construct a hypothetical sale pursuant to which a fair value could be determined. All of the sale terms other than price are assumptions based on the reasonable person's conduct. These fixed assumptions permit the appraisers to calculate a fair value price that reflects the actual health of the corporation. Once the fair value is determined, the superior court's job is done. Section 2000 authorizes the court to set only one term of the contemplated sale—the price. Once the fair value price for the corporation is set, the parties must negotiate the remaining sales terms.

At oral argument, Severson's counsel asserted that the only reason Mart is now willing to sign a noncompete is because the competing business Mart was attempting to establish when he initiated the dissolution proceeding has now failed. Again, whether true or not, Severson's contention is not relevant. *Section 2000 results in the establishment of a fair value price as of the valuation date.* It does not result in an actual sale as of that date. The covenant not to compete is a term of the sale. Aside from the price, which is governed by section 2000, negotiations pertaining to the terms of the sale must be conducted by the parties themselves *after* the fair value is determined.

Furthermore, Severson's plea for fairness actually undermines his position. If we affirm the trial court's holding, a purchasing party could always deprive a moving party of the going concern value of his or her corporate shares simply by rejecting the moving party's proposed covenant not to

compete (as Severson repeatedly did in this case). Under the trial court's reasoning, the absence of such a covenant would always result in a fair value price based exclusively on piecemeal liquidation value. Such a result flies in the face of the statutory definition of fair value, which expressly requires that the possibility of a sale of the entire corporation as a going concern in liquidation must be reflected in the fair value price. (§ 2000.)

In contrast, when the covenant not to compete is properly viewed as a sales term outside the scope of section 2000, the moving party has a strong incentive to agree to give an effective covenant not to compete. Since the purchasing party has the right but no obligation to proceed with the buyout once the fair value is set, he may use his option of permitting the corporation to be liquidated as a bargaining tool for obtaining the moving party's covenant not to compete. In other words, if Mart refuses to execute a reasonable covenant not to compete, Severson can elect to proceed with a piecemeal liquidation and not pay Mart the fair value price. In that event, the price Mart would obtain for his shares would be substantially lower than their value.

Grasping for alternative ways to defend the April 17 decree, Severson challenges various aspects of the appraisers' methodology. But, in response to similar arguments made below, the trial court requested and obtained a clarification of the appraisers' methodology. Thereafter, the court did not reject or question any of the appraisers' methods. Furthermore, Severson's criticisms are either too superficial or improperly focus on only one aspect of the multifaceted analysis the appraisers employed. Finally, we reject Severson's specific contention that the November 30 report is flawed because the appraisers failed to consider the "cost approach," i.e., the piecemeal liquidation method. As noted in our factual summary, all three appraisers expressly did consider the piecemeal liquidation value of Bay World and each independently concluded that value did not reflect Bay World's fair value.

Finally, Severson argues that the trial court had the power and the obligation to correct the allegedly erroneous November 30 report. ▆ We agree that when "the determination of the fair value of the shares by the appraisers, or a majority of them, is erroneous, it is 'the duty of the trial court to examine the matter de novo and to fix a proper value. . . .' [Citation.]" (*Ronald v. 4-C's Electronic Packaging, Inc.* (1985) 168 Cal.App.3d 290, 301 [214 Cal.Rptr. 225].) ▆ However, in the present case, the trial court *did not* conclude that the appraisers' determination of Bay World's fair value was erroneous. Rather, it concluded that Mart was entitled only to the piecemeal liquidation value of his Bay World shares. That conclusion is erroneous in light of (a) the appraisers' unanimous conclusion that Bay

World could have been sold as a going concern in liquidation on the valuation date and (b) the section 2000 requirement that the fair value determination must take into account the possibility that a corporation can be sold as a going concern in liquidation.

In summary, the trial court's conclusion that the fair value of Bay World is $1.48 million is not supported by substantial evidence and is based on an erroneous application of section 2000. Therefore, that ruling is reversed and the superior court is instructed to confirm the fair value determination set forth in the November 30 report.

## V. Disposition

The April 17 decree is reversed, and this case is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are awarded to appellant.

Kline, P. J., and Ruvolo, J., concurred.