Filed 10/7/21  Polycomp Trust Co. v. Agbede CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| POLYCOMP TRUST COMPANY, as Custodian, etc. et al.  Plaintiffs and Respondents,  v.  SONNY AGBEDE et al.,  Defendants and Appellants. | E075924  (Super.Ct.No. CIVDS1614139)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Sachs and Lynn M. Poncin, Judges.[*]  Affirmed as modified with directions.

William Dolph Beck and Rahel Goharchin Javaheri for Defendants and Appellants.

Krishel Law Firm and Daniel L. Krishel for Plaintiffs and Respondents.

---

[*]       Judge Sachs ruled on the fair value motion.  Judge Poncin entered the deficiency judgment.

1

In this action for judicial foreclosure, the trial court accepted the testimony of the lenders'[1] expert that the fair value of the property was $15,000; it rejected — listing multiple reasons — the testimony of the borrowers'[2] expert that the fair value of the property was $149,000. It entered a deficiency judgment based on the $15,000 valuation.

The Borrowers appeal. They contend that the trial court erred by finding that the fair value of the property was $15,000 rather than $149,000. This contention borders on the frivolous. There were serious flaws in the Borrowers' expert's analysis. At a minimum, the trial court could reasonably find him not credible.

On our own motion, however, we will correct one typographical error in the judgment, which will reduce its amount somewhat.

---

[1] There are four lenders (collectively Lenders), who each hold a fractional interest in the deed of trust:

(1) Entrust Group, Inc., FBO Bob D'Alessio IRA #11002, which holds 68 percent;

(2) Polycomp Trust Company, Custodian, FBO Richard Temme Roth IRA, which holds 21.333334 percent;

(3) Southwest Bancorp Defined Benefit Pension Plan, which holds 7.11111 percent; and

(4) Polycomp Trust Company, Custodian, FBO Michelle Rodriguez Roth IRA, which holds 3.555556 percent.

[2] There are two borrowers (collectively Borrowers), Sonny Agbede and George Karapanian.

# I

## STATEMENT OF THE CASE

This is an action for judicial foreclosure. The trial court granted the Lenders' motion for summary judgment. Thus, it entered a judgment ordering a foreclosure sale, finding the amount due to be $381,713.49 (plus costs, including attorney fees), and declaring the Borrowers liable for any deficiency. Later, the trial court awarded $45,266 in attorney fees, making the total indebtedness $426,979.49.[3]

On April 24, 2019, the property was sold in a foreclosure sale. Polycomp bought in the property, with a credit bid of $49,000.

The Lenders then filed a motion for a fair value determination. As discussed in more detail below, the Lenders' expert testified that the fair market value of the property was $15,000, the Borrowers' expert testified that the fair market value of the property was $149,000.

The trial court found that the fair value of the property was $15,000. It entered a deficiency judgment for $411,979.49.

# II

## THE EVIDENCE OF FAIR VALUE

The Borrowers contend that the trial court erred by finding that the fair value of the property was $15,000 rather than $149,000.

---

[3] The trial court also awarded costs. However, the Lenders took no steps to have these included in the deficiency judgment.

A.     *Additional Factual and Procedural Background.*

1.     *The lenders' appraiser.*

The property at issue consists of 0.5464 acres, i.e., 23,801 square feet, on West Main Street in Barstow.  At one time, it was improved with two retail buildings.  In August 2017, however, the buildings were damaged by fire, and later they were demolished.

The Lenders' expert appraiser, Steven R. Fontes, valued the property by looking at comparable sales.  He found four of these.[4]  After adjustments for location, site size, access, shape, off-site improvements, and land use, the sale prices per square foot of these comparables ranged from $0.24 to $1.13.  Fontes selected $0.60 as being roughly in the middle and "as appropriate, considering all the market data."  This resulted in an estimate of $14,281, which he rounded up to $15,000.

Thus, Fontes opined that the fair value of the property as of April 24, 2019, the date of the foreclosure sale, was $15,000.

2.     *The borrowers' appraiser.*

The Borrowers' expert appraiser, Alan R. Sims, relied on just one comparable:  a property at 147 West Main Street (other property), which had sold for approximately $100,000 on March 12, 2019.  The comparable was smaller than the subject property —

---

[4]     Fontes noted a fifth comparable property, which was listed for sale but had not yet been sold; ultimately, he did not include it in his calculations.

just 13,052 square feet.**5**  Also, "it contained an old building that needs restoration, retrofitting or razing, which will be an additional cost."  The building had two stories, with a "[b]usiness on the bottom" and a "rental on the top."  However, when listed for sale, it was vacant and not producing income.

Sims calculated the value of the subject property as follows:

1.  Demolition of the building at the other property would cost $18,000.

2.  He subtracted the $18,000 demolition cost from the $100,000 sale price, resulting in a "residual land value" of $82,000, or $6.28 per square foot.

3.  At $6.28 per square foot, the subject property would be worth $149,470, which he rounded down to $149,000.

Thus, in Sims's opinion, the fair value of the property was $149,000.

### 3.      *The trial court's ruling*.

The trial court ruled that "[The Lenders] have met their burden to establish the fair value of the property is $15,000, and [the Borrowers] have failed to offer evidence refuting this."

It found that Sims's valuation was not credible, for four reasons:  (1) he used only one comparable; (2) his "failure to respond to Fontes' report raises questions about his investigation"; (3) he compared the subject property which was vacant, to "income-

___

**5**      It is not clear how Sims arrived at this square footage.  The documents concerning the other property that he attached to his declaration show a lot width of 28 feet and a lot depth of 54 feet, for a total of 1,512 square feet.

producing commercial rental property"; and (4) he did not testify to the value of the subject property specifically as of the date of the foreclosure sale.

It therefore found, in accordance with Fontes's opinion, that the fair value of the property was $15,000.

B. *Discussion*.

1. *General legal background*.

"'A deficiency judgment" is a personal judgment against a debtor for a recovery of the secured debt measured by the difference between the debt and the net proceeds received from the foreclosure sale.' [Citations.]" (*Dreyfuss v. Union Bank of California* (2000) 24 Cal.4th 400, 407.)

Under section 580a,[6] however, the creditor cannot recover more than the difference between the debt and "the fair market value of the real property . . . at the time of sale." In other words, the amount of the deficiency judgment must be the amount of the debt, minus *either* the proceeds of the foreclosure sale *or* the fair market value, whichever produces the *smaller* deficiency judgment.

"To establish the amount of the deficiency, the foreclosing creditor must file an application for a fair value determination and a deficiency judgment within 3 months after the date of the foreclosure sale and as part of the foreclosure action. [Citations.]"

---

[6] This and all further citations are to the Code of Civil Procedure, unless otherwise specified.

(1 Bernhardt et al., Cal. Mortgages, Deeds of Trust, and Foreclosure Litigation (Cont.Ed.Bar 4th ed. 2019) § 3.87 (Bernhardt).)

In an appeal from a deficiency judgment, if any statutory construction is necessary, "[t]he meaning and construction of a statute is a question of law, which we decide independently. [Citation.]" (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 189.) Otherwise, "[t]he determination of fair value is factual in nature." (Bernhardt, *supra*, § 3.88.) Accordingly, we apply the substantial evidence standard of review. (Cf. *Mart v. Severson* (2002) 95 Cal.App.4th 521, 530 [finding of fair value of stock]; see, e.g., *City Bank of San Diego v. Ramage* (1968) 266 Cal.App.2d 570, 585-586.)

Under this standard, we must sustain the trial court's finding if it is supported by "any substantial evidence, contradicted or uncontradicted . . . ." (*Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429.) "We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . . [Citations.]" (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

2. *Problems with Sims's opinion.*

a. *Sims used only one comparable.*

The trial court found that Sims was not credible, in part because he considered only one comparable property. The Borrowers do not discuss this point. It afforded ample reason, all by itself, to disregard Sims's testimony.

7

As the Borrowers say themselves, "Comparable sales are an integral part of valuation in California." This method has been codified in Evidence Code section 816. "Under this method, the appraiser identifies sales of properties deemed to resemble the [subject] property in relevant respects, and then derives a market value for the [subject] property from the prices paid for these 'comparables,' typically adjusting the price to reflect such matters as material differences between the properties and differences in market forces between the time and location of the comparable sale and that of the property being valued." (*Emeryville Redevelopment Agency v. Harcros Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1094.)

It stands to reason that a valuation is more accurate if it is based on an average of multiple comparable sales rather than on just one single comparable sale. That sale may be a fluke. Moreover, using just one sale suggests that the appraiser has cherry-picked from among the available comparables, seeking the one that is highest or lowest, whichever best suits the client's interests.

Here, Fontes used four comparables. Sims used only one. It was way out of line with Fontes's four. Moreover, Sims did not explain why he ignored the four that Fontes used.

The Borrowers argue — with some chutzpah — that Fontes's appraisal was unreliable because he did not consider the March 2019 comparable that Sims did. Fontes could properly reason, however, that it was not truly comparable, because it was improved and/or because it was smaller than the subject property. (See part II.B.2.c,

8

*post*.) All else being equal, a smaller property will have a higher price per square foot. Fontes's comparables were all about the same size as or larger than the subject property. In addition, as mentioned, it was not clear how Sims determined the square footage of the other property. *Sims's* appraisal was unreliable because *it* did not consider the four comparables that *Fontes* did — and for no apparent reason.

    b.   *Sims did not respond to Fontes's analysis*.

   The Borrowers claim that Sims did respond to Fontes's analysis, and that the trial court erred by finding otherwise. All Sims said about Fontes's analysis was that he had read it and, in his opinion, it was too low — "more of a liquidation value." However, he did not criticize Fontes's methods; he did not explain where Fontes had supposedly gone wrong. His "response" was mere name-calling, not a reasoned explanation.

    c.   *The comparable that Sims used was improved*.

   The trial court also reasoned that Sims was improperly comparing vacant land to improved commercial rental property. The Borrowers mischaracterize this as a finding that "the building on the comparable was added value and that [the] subject property was of less value as vacant." They then argue that their property was actually worth *more* after the building that had been on it burned down.

   There is no *evidence* that their property was worth more. They claim it was "a 1940's style wooden building, with old plumbing and electrical." However, there is no evidence of this, nor is there any evidence that such a building makes the property that it is on less valuable.

More to the point, the trial court did not find that the other property was worth more simply because it had a building on it.  Rather, it ruled that it was *not genuinely comparable*, not only because it had a building on it, but also because that building was potentially income-producing.  It is not unreasonable to conclude that, all else being equal, a property with an income-producing improvement is worth more than a vacant property.  In any event, it is surely not unreasonable to conclude that such a property is not a valid comparable.

> d.     *Sims did not assign a date to his valuation*.

The trial court also reasoned that Fontes had testified to the fair value of the property *as of April 24, 2019*, the date of the foreclosure sale, whereas Sims had merely testified to the fair value of the property, without specifying a date.  By statute, the trial court must make a finding as to the fair value of the property as of the date of the foreclosure sale.  (§§ 580a, 726, subd. (b).)  Because Fontes testified specifically to that and Sims did not, the trial court could reasonably disregard Sims' opinion.

Arguably, it could have done otherwise.  It could have reasoned that Sims's opinion was based on a comparable sale in March 2019, and thus — at least inferably — in Sims's opinion, the value of the subject property had remained constant from March through July 2019 (the date of his declaration).

However, it was not required to draw this inference.  Sims did not specifically *state* that in his opinion the valuation was unchanged, nor did he explain how he

determined that it was not. In the absence of such assurances, the trial court could properly conclude that Sims's opinion was not sufficiently reliable.

Even assuming the trial court did err by taking into account Sims's failure to give a date for his valuation, the error was undoubtedly harmless. As discussed above and below, there were ample other reasons not to rely on Sims's opinion.

> e. *Additional problems with Sims's opinion*.

There were problems with Sims's opinion even beyond the four that the trial court identified. Sims stated that the building on the other property "need[ed] restoration, retrofitting or razing . . . ." However, he considered only the cost of razing it. The new owner might well prefer restoration or retrofitting, which would save the cost of building a whole new building. Sims did not consider those costs. More important, because the building on the other property *could be* restored or retrofitted, the other property was simply not comparable to the subject property.

Even more grievously, Sims *subtracted* the cost of demolition from the sale price of the other property. This makes no sense. If a buyer is willing to pay $100,000 for a property, and then to pay $18,000 to demolish a building on it, then surely the fair market value of the same property without a building is $118,000, not $82,000. This is an odd error for Sims to make, as it actually resulted in *understating* the fair value of the subject property. For that very reason, however, it called his expertise and his credibility into question.

11

### 3. *The basis for Fontes's opinion.*

Most of the Borrowers' brief is devoted to arguing that the trial court erred by rejecting Sims's opinion. However, they also argue that it erred by accepting Fontes's opinion, because the list of comparables that he used was "based on no proximate comparable sales, but rather a summary of land data that may or may not include a proper comparable, but rather an unauthenticated list of [four] pieces of land. The date that summary of land data was prepared, and under what circumstance, was missing and is important for proper authentication and context."**7**

In his report, Fontes stated, "[W]e began by searching for sales of similarly sized [and zoned] parcels with similar locations, as well as similar physical characteristics. A search of the public records was made, as well as discussions with brokers active in the subject market area. *The sales data selected as most relevant are summarized on the following . . . table*." (Italics added.) Thus, Fontes did explain the circumstances under which his list was prepared; the list was authenticated; and Fontes's opinion was based on comparable sales. The date when the list was prepared is irrelevant.

### 4. *Conclusion.*

We therefore conclude that the trial court could reasonably believe Fontes's opinion and disbelieve Sims's. Thus, its fair value finding was supported by substantial evidence.

---

**7** The Borrowers also complain that Fontes's list of comparables is "illegible." There are two copies of that list in the record. One is, in part, illegible, but the other is perfectly legible.

### III

### TYPOGRAPHICAL ERROR IN THE JUDGMENT

Independently, we have identified one typographical error in the judgment.

The deficiency judgment is for $411,979.49. This is equal to $426,979.49, the amount of the foreclosure judgment, minus $15,000, the fair value of the property. However, the foreclosure sale price, $49,000, was more than the fair value, $15,000. Accordingly, the judgment should be for $426,979.49, the amount of the judgment, minus $49,000, the sale price. (§ 580a.) The correct amount is $377,979.49.

We will modify the judgment accordingly.[8]

### IV

### DISPOSITION

The judgment is modified so as to award the amount of $377,979.49 instead of $411,979.49. The judgment, as thus modified, is affirmed. The trial court is directed to enter an amended judgment, nunc pro tunc, modified accordingly. In the interest of justice, the Lenders are awarded costs on appeal against the Borrowers.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:
SLOUGH _____
J.
RAPHAEL _____
J.

---

[8]  At oral argument, counsel for the Lenders said this proposed modification was "fine."

13