Filed 2/15/23  Marriage of Sibillo and Delgado CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re the Marriage of AGOSTINO SIBILLO and JOHANNA DELGADO. | |
| AGOSTINO SIBILLO, Appellant, v. JOHANNA DELGADO, Respondent. | E075222, E075660 (Super.Ct.No. SWD1600091) OPINION |

CONSOLIDATED APPEALS from the Superior Court of Riverside County. Elaine M. Kiefer, Judge.  Affirmed in part and reversed in part with directions.

Bickford Blado & Botros, Andrew J. Botros; Angeloff, Angeloff & Levine, and Michael J. Angeloff for Appellant.

No appearance for Respondent.

1

Agostino Sibillo appeals from a judgment on reserved issues in this marital dissolution action. During the marriage, Sibillo formed a corporation called SpyChatter, Inc. (SpyChatter). Stock in SpyChatter was one of the primary community property assets. On appeal, Sibillo challenges the trial court's valuation of the SpyChatter shares. He also challenges the court's child support order in two respects: the court's determination of his income available for child support, and the court's timeshare determination for purposes of calculating retroactive child support.

We reverse the judgment in part. We agree with Sibillo that the court's timeshare determination is not supported by substantial evidence, so we reverse the award of retroactive child support. The court shall recalculate the amount that Sibillo owes for retroactive child support on remand. Sibillo's remaining challenges lack merit, however, so we affirm the judgment in all other respects.

BACKGROUND

Sibillo and Johanna Delgado were married in August 2007 and had a daughter in 2014. In January 2016, Sibillo filed a petition for legal separation. Delgado's response requested that the court dissolve the marriage. The parties stipulated to a separation date of October 12, 2017.

In March 2018, the court entered a partial judgment regarding child custody and visitation. The partial judgment did not include a child support order. The court gave Sibillo sole legal and physical custody of the parties' child. Delgado had visitation every other Saturday for four consecutive visits. After that, she had visitation every other weekend, from Saturday at 9:00 a.m. to Sunday at 5:00 p.m. The parties agreed to work

2

out a holiday schedule. The partial judgment reserved jurisdiction on all other issues. The court entered a status-only judgment of dissolution in October 2018.

Delgado filed a request to modify the child custody and visitation order in August 2018. She wanted primary physical custody of the parties' child and joint legal custody. Her request was still pending at the time of trial on the reserved issues. That trial took place on 19 days in June, October, and December 2019. The parties had never reached an agreement on a holiday schedule, and Delgado had not had any holiday visits with their child. During trial, the court ruled that Delgado had made a prima facie showing of changed circumstances, and it added custody to the reserved issues to be determined at trial. (See *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256 ["Under the so-called changed circumstance rule, a party seeking to modify a permanent custody order can do so only if he or she demonstrates a significant change of circumstances justifying a modification"].)

In the following subparts, we summarize the relevant trial evidence and the court's statement of decision after trial.

I. *The Corporations and Sibillo's Cash Flow*

Sibillo is a software engineer, among other things. In 2013, he formed a corporation called Liveofme Inc. (Liveofme). Claudio Fazzone invested in Liveofme in June 2014 and received 33,000,000 shares of Liveofme common stock. Sibillo then owned 1,000,000 shares of Liveofme stock. The corporation issued 3,000,000 more shares to Sibillo in exchange for his agreement to act as an independent contractor developing and patenting inventions for Liveofme.

3

The parties started to enjoy a lavish lifestyle around the time of Fazzone's investment in Liveofme. According to Sibillo's independent contractor agreement, Liveofme paid him $120,000 annually and reimbursed him for business-related expenses, including gas, meals, clothes, and travel. The corporation also "encourage[d]" him to "purchase motor vehicles in order to create around himself a better and stronger CEO image," and it agreed to cover 50 percent of any such purchase.

Liveofme also extended a line of credit to Sibillo that he could use for personal expenses. Fazzone and Sibillo, in their capacities as directors of the corporation, authorized the line of credit by unanimous written consent in August 2014. The documentation characterized the $800,000 line of credit as a loan to Sibillo. Sibillo could draw on the line of credit until August 2016. Interest accrued at the rate of 2 percent per year, and the outstanding principal and interest were due and payable in August 2019. Sibillo executed a promissory note memorializing those terms.[1]

Fazzone loaned Sibillo $999,945 in April 2015. Sibillo agreed to pay 1.6 percent interest per year and repay the loan in one lump sum in January 2020. Sibillo and Delgado immediately used $340,000 or $350,000 of the Fazzone loan to buy a house.

In August 2015, Sibillo formed SpyChatter, and Liveofme became a wholly owned subsidiary of SpyChatter. Sibillo became the chief executive officer of

---

[1] Although the unanimous written consent authorized an $800,000 line of credit, in the promissory note, Sibillo promised to pay back the "actual amount borrowed . . . up to eight-hundred and fifty thousand (850,000) dollars."

SpyChatter and owned 4,000,000 shares of SpyChatter stock. SpyChatter had 30 to 60 total investors and was a closely held corporation.

In August 2016, SpyChatter extended the period during which Sibillo could draw on the Liveofme line of credit to August 2022. SpyChatter also extended a second line of credit to Sibillo, characterized as "an additional loan." The corporation capped that line of credit at $850,000. The unanimous written consent authorizing the SpyChatter line of credit provided for a 2 percent interest rate and a repayment date of August 2022.

Sibillo used the lines of credit for community purposes—for instance, to remodel the parties' house, buy cars and handbags, travel internationally, and buy meals. The parties spent approximately $1 million improving the house.

According to Sibillo, he also used part of the Fazzone loan to pay down part of the Liveofme line of credit. He "[s]ometimes" used his $120,000 annual salary to pay down the line of credit. He had repaid approximately $900,000 on the lines of credit.

In 2017 and 2018, SpyChatter sold over 1.6 million shares at $1 per share. Between May and October 2019, SpyChatter shares sold for $0.31. The corporation sold 1,700,000 shares at the $0.31 price. SpyChatter's board of directors consisted of Sibillo, Fazzone, the chief financial officer, and one more director. The board of directors set the share price.

II. *The SpyChatter Patent*

SpyChatter owned the rights to a patent, the geolocation-based encryption method and system patent (the geolocation patent). Sibillo invented the technology described in the patent and obtained the patent in April 2018, and he transferred his rights in it to

5

SpyChatter. SpyChatter was a "'nonparticipating entity,'" meaning that its business model was to develop intellectual property, procure patents, sue others who infringed the patents, and negotiate license agreements for use of the patented technology.

But SpyChatter had also developed a smartphone app, which it made available for free and used for scavenger hunts in Mexico. The corporation hid money around the city, and the participants used the SpyChatter app to find the hidden money. Sibillo described the SpyChatter app as "the next generation of augmented reality." The app was not available in the Google or Apple stores. The app worked but could not handle millions of users and was still in developmental phases.

In February 2018, a patent lawyer conducted an infringement analysis to determine whether the Pokémon Go app infringed SpyChatter's geolocation patent. The lawyer concluded that it was unlikely that the app would be found to infringe the geolocation patent. Sibillo commissioned a second infringement analysis to determine whether a Snapchat feature infringed the geolocation patent. That analysis recommended that SpyChatter not pursue an infringement case against Snapchat.

Sibillo obtained a valuation of the geolocation patent in May 2018. He was trying to attract new investors and raise more capital with the patent valuation. The patent valuation report concluded: "As the total global [augmented reality] and [virtual reality] industry is estimated to be $17.8 billion currently in 2018, it is assumed that the patent holder will be able to capture an optimistically conservative 5% of the US market in year 1, generating an annual revenue of $133.5 million." The report assumed 30 percent net operating costs, average growth per year of 50 percent for the remaining 17-year life

of the patent, and a discount rate of 20 percent. The report valued the patent between $14.13 billion and $15.62 billion. But Sibillo thought that the patent infringement analysis "killed" the patent valuation, because the infringement analysis showed that SpyChatter was not in a position to litigate and control the relevant area of intellectual property.

III. *Expert Testimony Regarding SpyChatter Valuation and Cash Flow*

At trial, each party offered expert testimony about the value of Sibillo's 4,000,000 SpyChatter shares and his cash flow available for support.

A. *Gregory Wiebe*

Delgado's expert, Gregory Wiebe, was a certified public accountant with extensive experience as a court-appointed expert in family law matters under Evidence Code section 730. He frequently served as an expert for valuing businesses, determining cash flow available for child and spousal support, tracing funds, and characterizing assets.

Wiebe determined the value of the 4,000,000 SpyChatter shares using three valuation methods—the market data method, the single-period capitalization method, and the excess earnings method.

For the market data method, Wiebe based his valuation on the SpyChatter stock transactions between April 2017 and July 2018. During that period, there were over 50 transactions with unrelated third parties, resulting in the sale of approximately 1.65 million shares at $1 per share. At $1 per share, Wiebe valued Sibillo's shares at $4,000,000 under this method. After Wiebe conducted his valuation, he received records

showing additional stock transactions through September 2018. Those records supported his determination that SpyChatter stock was selling at $1 per share. If there were transactions that occurred closer to the trial date, Wiebe would have to look at the nature of those transactions before deciding whether to factor them into his valuation. That is, he would consider whether they were "arm's-length transactions" with "outside third parties," or whether there was "some other reason behind these sales."

As for the single-period capitalization method, which Wiebe also described as "a capitalization of earnings," he evaluated SpyChatter's potential income stream to measure the value of the corporation's ownership interests. Wiebe described this method as "equat[ing] the value of the ownership interests with the amount an investor would be willing to pay today for the right to receive" periodic cash payments in the future. In performing his analysis, Wiebe based SpyChatter's potential net operating income on the patent valuation report that Sibillo had commissioned. Wiebe investigated certain assumptions by the analyst who authored the patent valuation report. For instance, according to the report, the analyst assumed that SpyChatter would capture 5 percent of the US market in year one, generating an annual revenue of $133.5 million. Wiebe looked at market data to determine whether the $133.5 million figure was accurate. He found that an augmented reality product would generate annual revenue between $100 million and $147 million. Wiebe's single-period capitalization method valued Sibillo's 4,000,000 shares at $4.54 million.

The excess earnings method looked at the underlying tangible and intangible assets of the business. Wiebe determined the value of the company's balance sheet and

8

the value of the intangible assets, such as goodwill. But this method did not include the value of the geolocation patent—the main asset of the company—because Wiebe did not have a way to value it independently. That was because the parties had agreed to keep certain information about the business confidential, and Wiebe could not develop a royalty rate for the patent without disclosing the confidential information to third parties. This method valued the 4,000,000 SpyChatter shares at $1,057,800.

Wiebe assigned a confidence level to each of the valuations—45 percent for the market data method, 45 percent for the single-period capitalization method, and 10 percent for the excess earnings method. He assigned only a 10 percent confidence level to the excess earnings method because he omitted any value for the geolocation patent. After applying the confidence levels to calculate weighted values under each method, Wiebe's final valuation for the 4,000,000 shares was $3,948,800, or $0.987 per share.

Wiebe was also tasked with determining Sibillo's monthly cash flow. He treated Sibillo's withdrawals on the SpyChatter and Liveofme lines of credit as cash flow available for support. Wiebe opined that the "loans" were "just merely an accounting summary of the checks [Sibillo] writes to support himself from the company." The bank statements showed that Sibillo used the withdrawals on the lines of credit to support his lifestyle. Wiebe explained: "I looked at not only what's his income, but what is his ability to use the company funds to support his lifestyle, which . . . the Court in this case may want to know in order to determine both child support and spousal support."

Wiebe determined that Sibillo's annual average cash flow for 2014 through 2017 was $546,300, or $45,525 per month. That figure included Sibillo's yearly salary of

9

$120,000, payments for cars and other corporate perquisites, and withdrawals on the Liveofme and SpyChatter lines of credit totaling over $1.52 million.

Wiebe saw no indication in the corporate books or records that Sibillo had attempted to repay the money that he withdrew on the lines of credit. While the corporate tax returns reported the withdrawals as loans, and Sibillo said that he had made some repayments, the corporation did not report any interest income from the claimed repayments. Wiebe thought that the corporate tax returns reported Sibillo's withdrawals as loans because if they were reported as anything else, Sibillo would have to pay income tax on them. Wiebe also observed that the corporation had recently amended some of its tax returns to recharacterize some of the claimed loans as "R and D expenses."

Regarding Sibillo's claim that he had repaid $900,000 on the lines of credit, Wiebe was not aware that "Sibillo had $900,000 of assets from anywhere in which to make that repayment." If that repayment had occurred, Wiebe would be interested in knowing the source of those funds. He was aware that one of the primary shareholders of the corporation had loaned Sibillo roughly $1,000,000.

B. *Christian Tregillis*

Sibillo's expert, Christian Tregillis, was a certified public accountant with experience in forensic accounting, valuing businesses, and intellectual property. Tregillis had never served as a court-appointed expert in a family law matter under Evidence Code section 730.

Tregillis disagreed with Wiebe's valuation of the SpyChatter shares under the market data method, which used the $1 share price. Liveofme and SpyChatter shares

10

sold for $0.07, $0.11, and $0.32 from 2014 through 2017. Many of those early transactions occurred before Sibillo and SpyChatter had procured the geolocation patent in 2018. The shares sold for $1 from mid-2017 through the end of 2018. The shares sold for $1 even after the February 2018 patent infringement analysis concluded that the Pokémon Go app likely did not infringe the geolocation patent. But most recently, in May through October 2019, the shares had sold for $0.31. Many of the most recent transactions occurred after the trial started in June 2019.

Sibillo played a key role in setting the price of SpyChatter shares. The issue would likely have to go before the company's board of directors, but Sibillo had an "important impact" on the board. His input on the price of shares was significant, because he knew the business better than anyone else.

Tregillis also disagreed with Wiebe's valuation under the single-period capitalization method, because it assumed that SpyChatter would have around $134 million in revenue, meaning that the corporation would "become the largest company in the United States, more profitable and larger in size than Apple." The valuation also assumed that SpyChatter would capture 5 percent of the United States market in augmented and virtual reality, but the corporation was not in the virtual reality market and had no plans for a product. Tregillis opined that those assumptions were not "at all aligned with what the company actually does."

Like Wiebe, Tregillis also looked at Sibillo's cash flow. Tregillis examined bank statements showing that the proceeds of the Fazzone loan were deposited into the parties' joint bank account. He observed that a significant portion of the loan paid for the parties'

11

home and improvements to it. That loan and withdrawals on the lines of credit also paid for the parties' vacations, meals, surgery, cars, and other personal expenses.

According to Tregillis, the Internal Revenue Service defined a loan as "an agreement . . . whereby one person advances money to the other and the other agrees to repay it upon such term[s] as to time and rate of interest." Tregillis reviewed the promissory note relating to the Liveofme line of credit. It satisfied a number of factors that the tax courts consider when determining whether a transaction qualifies as a loan. The note set forth an obligation for Sibillo to repay the amounts withdrawn on the line of credit, an interest rate, and a date for repayment.

Tregillis examined Sibillo's, Liveofme's, and SpyChatter's bank statements, and he tracked Sibillo's withdrawals on the lines of credit and repayments that Sibillo made. Tregillis also ran a report in the companies' accounting software and examined the corporate tax returns to corroborate his examination of the bank statements.

As of the date of separation, the combined balance due on the Liveofme and SpyChatter lines of credit was $864,308.03. That number reflected the net amount due after examining the withdrawals on the lines of credit and the repayments, plus interest. Tregillis prepared schedules showing the various withdrawals and repayments on the lines of credit from 2014 to 2018. According to the schedules, Sibillo withdrew a total of $1,993,640.68 from the SpyChatter line of credit and repaid $994,297.40. On the Liveofme line of credit, Tregillis's schedules showed that Sibillo had withdrawn $631,580.29 and repaid $480,882.38. If there was interest income on the loans to the Sibillo, the corporate tax returns should have reflected that.

12

Tregillis said that he did not form an opinion as to whether the lines of credit should be considered income available for child support. He acknowledged that he was "not an expert in that area." But he opined that the lines of credit created liabilities, and the corporations and Sibillo treated them as "an obligation for repayment by Mr. Sibillo."

Tregillis determined that Sibillo's average annual income for 2014 through 2017 was $164,300. That included his annual salary of $120,000, plus corporate perquisites and car-related expenses for which the company paid. Tregillis excluded $382,000 per year attributable to withdrawals on the lines of credit. He disagreed with Wiebe's characterization of the lines of credit as advances or compensation, and he considered them to be loans.

IV. *The Statement of Decision*

After the bench trial, the court issued its final statement of decision in July 2020. The court characterized the 4,000,000 SpyChatter shares as community property. It summarized the experts' testimony regarding the value of the shares and concluded that Wiebe's testimony was "more convincing" than Tregillis's testimony. The court valued the shares at $0.987 each, concluding that the figure was "the most reliable price closest to trial based on all available evidence." Given that per share price, the court valued the community interest at $3,948,800, and it ordered Sibillo to make an equalization payment to Delgado for half the value of the shares ($1,974,400).

The court also found that the SpyChatter and Liveofme lines of credit were "in fact income" that Sibillo received from the corporations and that they were not

13

community debts.  The court determined that the personal loan from Fazzone, however, was a community debt for which both parties were equally liable.

As for custody and visitation, the court found that it was in the child's best interest for Sibillo to retain sole legal and physical custody.  The court noted that since the partial judgment, the parties had been "unable to co-parent . . . as to the holiday and visitation schedule."  The court modified visitation so that Delgado had visitation on the first, third, and fourth weekend of every month, from 4:00 p.m. on Friday to 7:00 p.m. on Sunday. The court also set a holiday schedule.

Regarding child support, the court determined that Delgado had a timeshare of 25 percent, meaning Sibillo's timeshare was 75 percent.  It also found that for purposes of calculating child support, Sibillo's annual income was $546,300, which included the withdrawals on the lines of credit.  The court imputed a minimum wage of $2,253 per month to Delgado.  Using those timeshare percentages and income figures, the court determined that Sibillo owed $1,077 per month in child support.  It further ruled that Sibillo owed that amount retroactively from August 15, 2018 (when Delgado filed her request to modify the custody and visitation order) to April 15, 2020.  The court found that the retroactive child support amounted to $21,540 ($1,077 per month for 20 months).

DISCUSSION

I. *Valuation of the SpyChatter Shares*

Sibillo argues that Wiebe made several errors when applying the single-period capitalization and market data methods to value the SpyChatter shares.  He contends that because the trial court adopted Wiebe's purportedly erroneous valuations, the record does

14

not contain substantial evidence to support the court's valuation of the shares.  Sibillo's arguments lack merit.

"The trial court's judgment is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670.)  In particular, the valuation of a community asset "is a factual question for the trial court, and its determination will be upheld on appeal if supported by substantial evidence in the record.  [Citation.]  All issues of credibility are for the trier of fact, and all conflicts in the evidence must be resolved in support of the judgment." (*Ibid*.)  In addition, "'when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.  If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.'" (*In re Marriage of Goodwin-Mitchell & Mitchell* (2019) 40 Cal.App.5th 232, 239.)

"'[T]here is no one applicable formula that may be properly applied to the myriad factual situations calling for a valuation of closely held stock.'" (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 632.)  The "court has broad discretion to select a valuation method that will most effectively achieve substantial justice between the parties," so long as "that method is within the range of the evidence presented." (*Id.* at p. 636.)  The "'court is not required to accept the opinion of any expert as to the value of an asset.' [Citations.]  Differences between the experts' opinions go to the weight of the evidence." (*Id.* at p. 632.)

A. *Single-Period Capitalization Method*

Wiebe described his single-period capitalization method as a "capitalization of earnings." The capitalization of earnings approach is one recognized method for determining the investment value of shares in a closely held corporation. (*Ronald v. 4-C'S Electronic Packaging, Inc.* (1985) 168 Cal.App.3d 290, 299; *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 882 (*Hewitson*).) The method starts with a determination of the "'expected net operating income'" of the corporation. (*Ronald*, *supra*, at p. 299, fn. 4.)

Sibillo relies primarily on case law concerning a different valuation method, the capitalization of excess earnings method. That method seeks to value the goodwill in a business, often a professional practice like a law or medical practice. (See, e.g., *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 818 [law practice]; *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 371 [medical practice].) Under the excess earnings method, "one first determines a practitioner's average annual net earnings (before income taxes) by reference to any period that seems reasonably illustrative of the current rate of earnings." (*In re Marriage of Garrity & Bishton* (1986) 181 Cal.App.3d 675, 688, fn. 14.) But goodwill may be valued by "any legitimate method of evaluation that measures its present value by taking into account some past result." (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 584 (*Foster*).)

Here, Wiebe used the projected revenue figure in the patent valuation report—$133.5 million—to calculate SpyChatter's expected net operating income. Sibillo argues that using the projected revenue figure was error, because Wiebe had to base the net

16

operating income on "some past result," just like methods that value the goodwill in a business. (*Foster*, *supra*, 42 Cal.App.3d at p. 584.) But Sibillo cites no authority for the proposition that the capitalization of earnings approach, which determines an investment value for the shares at issue, must follow the same methodology as approaches that value goodwill. Instead, he states in a conclusory fashion that "the evidentiary threshold" for both types of approaches should be "identical." That conclusory assertion fails to carry his burden of showing error on appeal. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 ["'The burden of affirmatively demonstrating error is on the appellant'"].)

Sibillo also argues that the projected revenue figure in the patent valuation report was "far too speculative," so Wiebe and the trial court could not rely on it. He relies on *In re Marriage of Rives* (1982) 130 Cal.App.3d 138 (*Rives*), but that case is distinguishable. In *Rives*, the husband ran a business raising queen bees. (*Id.* at p. 146.) The wife's expert witness used a "potential income approach" to value the goodwill in the business. (*Id.* at p. 147.) The expert "estimated what he considered the business should or could produce, and determined potential income at the highest seasonal price from that figure." (*Ibid.*) Specifically, the expert estimated that the husband should be able to produce 18,840 bees per year with the available 2,100 production units. (*Id.* at p. 150.) It was unclear how the expert arrived at that production figure. The husband's production had never approached that figure, and a competitor produced 30,000 bees per year with 12,000 to 15,000 production units. (*Ibid.*) The expert thus expected the husband to produce more than 60 percent of the competitor's output with less than 20

17

percent of the competitor's production units. (*Ibid.*) On that record, the *Rives* court held that no evidence supported the expert's production figure and that the expert based his goodwill valuation on "assumptions which [were] not proven." (*Ibid.*)

In this case, however, Wiebe did not base his valuation on his own unsupported revenue estimate. He based it on the report that Sibillo commissioned for the purpose of selling SpyChatter shares to investors. And the record demonstrates that after obtaining that patent valuation report in May 2018, SpyChatter sold shares at $1 until at least September of that year—by far the highest price in evidence. We cannot say that Wiebe erred by relying on the same projection that Sibillo and SpyChatter used to attract new investors, particularly when the goal of Wiebe's method was to determine the investment value of Sibillo's shares. Moreover, Wiebe testified that he conducted his own research to confirm the accuracy of the $133.5 million figure in the patent valuation report, and he found that an augmented reality product would generate annual revenue in the range of $100 million to $147 million. This case therefore is unlike *Rives*, in which the expert seemed to have plucked his production estimate from thin air.

Sibillo argues that Wiebe improperly relied on the patent valuation report for one more reason: The report considers the virtual reality market, and SpyChatter does not participate in that market. The patent valuation report did define the relevant industry as encompassing both augmented and virtual reality products. But again, Wiebe independently investigated the revenue figure in the report, and he determined that the report's conclusion was in the range of revenue for augmented reality products in particular.

18

In sum, to the extent that the trial court relied on Wiebe's valuation under the single-period capitalization method, Sibillo fails to demonstrate that the trial court erred or that the record does not contain substantial evidence to support the court's valuation.

B. *Market Data Method*

Subject to an exception not relevant here, the valuation date for the community's assets shall be "as near as practicable to the time of trial." (Fam. Code, § 2552, subd. (a); unlabeled statutory citations refer to the Family Code.) The market value of stock in a closely held corporation may be determined by looking at "recent sales of the unlisted stock, which were made in good faith and at arm's length, within a reasonable period either before or after the valuation date." (*Hewitson*, *supra*, 142 Cal.App.3d at p. 882; see also Evid. Code, § 815 [an opinion on the value of property may take into account the price at which the property sold "if the sale . . . was freely made in good faith within a reasonable time before or after the date of valuation"].)

Sibillo argues that the trial court erred by considering Wiebe's valuation under the market data method because Wiebe did not factor in the most recent stock transactions at $0.31 per share. We are not persuaded. Wiebe's market data valuation did not take those transactions into account because they had not yet occurred. His written report setting forth his valuation was dated May 5, 2019. He considered the most recent stock transactions that had occurred at that point—those at $1 per share in 2018. The trial

19

began on June 4, 2019.  The $0.31 transactions on which Sibillo relies started a few days later, on June 6, 2019.[2]

The trial court too was not required to value the shares using the $0.31 price, but for different reasons.  The court's statement of decision made clear that the court considered the evidence.  The court mentioned the "most recent stock sales . . . at $0.31 per share" when it summarized the experts' testimony.  However, the court found that the $0.987 price was the "most *reliable* price closest to trial."  (Italics added.)  In other words, the court implicitly found that Sibillo's evidence of the 2019 transactions was not reliable for purposes of valuing the shares.

The record contains substantial evidence to support that determination.  (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501 ["The substantial evidence standard of review applies to both express and implied findings of fact made by the court in its statement of decision"].)  SpyChatter's board of directors was responsible for setting the share price.  Sibillo was on the board, and his expert acknowledged that Sibillo had an important impact on the board, his input on the price of shares was significant, and he played a key role in setting the price.  The new $0.31 price was a substantial reduction from the $1 price in late 2018.  Sibillo testified that the patent infringement analysis "killed" the patent valuation, suggesting that the patent infringement analysis might be responsible for the drop in price.  But the infringement analysis was done in February 2018, the patent valuation was done in May 2018, and SpyChatter shares continued to

---

[2]     Sibillo testified that the $0.31 transactions started in May 2019, but the exhibit to which he referred shows that the earliest transactions occurred on June 6.

20

sell for $1 for several months after that. The trial court could reasonably infer from all of that evidence that (1) Sibillo influenced the board to set a much lower price right around the time of trial and (2) those 2019 sales were not "made in good faith" (*Hewitson*, *supra*, 142 Cal.App.3d at p. 882) but were an effort to undervalue the shares for purposes of the marital dissolution action. The trial court had the exclusive power to draw reasonable inferences, weigh the evidence, and judge credibility, and we may not disturb its judgment in those respects. (*Tucker v. Pacific Bell Mobile Services* (2010) 186 Cal.App.4th 1548, 1562.)

Relying on *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113 (*Zuckerman*), Sibillo asserts that we "cannot defer to the trial court's traditional role in drawing inferences and resolving conflicts in the evidence" if an expert bases a valuation on a "temporally remote transaction." (*Id.* at p. 1136.) *Zuckerman* is inapposite. There, the court held that the expert's valuation of property was not supported by substantial evidence for numerous reasons, including that the expert relied on a remote transaction and rejected "more comparable transactions." (*Ibid.*) The remote transaction occurred in 1958, while the date of valuation was 1982. (*Id.* at pp. 1129, 1132.) This case is not at all similar—the date of valuation was 2019, and the transactions on which the trial court relied occurred from April 2017 to September 2018. The most recent of those transactions occurred less than one year before the valuation date, as opposed to the 24 years between the transaction and the valuation date in *Zuckerman*. The court reasonably concluded that the 2017 and 2018 transactions were "recent sales . . . within a reasonable period" before the valuation date. (*Hewitson*, *supra*, 142 Cal.App.3d at p. 882.)

21

Sibillo also argues that Wiebe's testimony shows that the court erred, because Wiebe testified that if there were more recent transactions at a price other than $1 per share, he would have to consider them. But Sibillo mischaracterizes Wiebe's testimony. Wiebe did not state without qualification that he would factor in such transactions. He explained that he would have to look at the nature of the transactions, including whether they were at arm's length or whether there was "some other reason behind these sales." That testimony was consistent with the case law holding that recent sales may be probative if they were made in good faith and at arm's length, and the testimony supports the court's findings in this case.

For all of these reasons, Sibillo fails to show that the court erred by relying on Wiebe's market data valuation or that the court's valuation is not supported by substantial evidence.

## II. *Income for Child Support Purposes*

Sibillo challenges the trial court's finding that the SpyChatter line of credit constituted income for purposes of calculating child support. He asserts that the court erred because it relied on Wiebe's testimony that Sibillo did not have the resources to repay the withdrawals on the line of credit. We reject the argument.

"We review child support awards for abuse of discretion. [Citations.] 'We review factual findings regarding a child support award for substantial evidence. [Citations.] That review requires us to consider the record in a light most favorable to the [prevailing party], and to presume the existence of every fact that reasonably could be deduced from

the evidence.'"  (*County of San Diego v. P.B.* (2020) 55 Cal.App.5th 1058, 1068 (*County of San Diego*).)

Courts must calculate child support in accordance with a statewide uniform guideline.  (§§ 4052, 4055; *County of San Diego*, *supra*, 55 Cal.App.5th at p. 1069.)  The guideline is expressed as a mathematical formula in section 4055.  One component of the guideline formula is the "high earner's net monthly disposable income."  (§ 4055, subd. (b)(1)(C).)  That "figure is computed by totaling 'annual gross income' less allowable deductions, and dividing by 12."  (*In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1336.)

The statutory scheme broadly defines income for purposes of child support.  (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 285.)  "[A]nnual gross income . . . means income from whatever source derived," subject to a few exceptions not relevant here.  (§ 4058, subd. (a).)  The Family Code lists more than a dozen possible sources of income, including things like salaries, wages, royalties, bonuses, income from the proprietorship of a business, and employee benefits, "taking into consideration the benefit to the employee, any corresponding reduction in living expenses, and other relevant facts."  (§ 4058, subd. (a)(1)-(3).)  But the codified list is not exhaustive—it is "'by way of illustration only.'"  (*Cheriton*, *supra*, at p. 285, italics omitted.)  "The judicially recognized sources of income cover a wide gamut."  (*Ibid.*)  For instance, "phantom income" attributable to the forgiveness of debt is considered income for child support purposes.  (*In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1080.)  Loans

carrying an expectation of repayment, however, are not income for purposes of calculating child support. (*In re Marriage of Rocha* (1998) 68 Cal.App.4th 514, 517.)

Sibillo's expert, Tregillis, relied on the federal tax law definition of a loan in his testimony. For federal tax purposes, the court examines a transaction as a whole to determine whether it qualifies as a loan. (*Welch v. Commissioner* (9th Cir. 2000) 204 F.3d 1228, 1230 (*Welch*).)[3] "The conventional test is to ask whether, when the funds were advanced, the parties actually intended repayment." (*Ibid.*) "However, courts have considered a number of other factors as relevant in assessing whether a transaction is a true loan, such as: (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan. [Citations.] Although the factors are non-exclusive and no single factor is dispositive, these indicia of a bona fide loan form a general basis upon which courts may analyze a transaction." (*Ibid.*)

Here, substantial evidence supports the court's finding that the SpyChatter line of credit was income and not a true loan. The lines of credit supported the parties' lifestyle

---

[3] During Tregillis's testimony, Sibillo asked the court to admit into evidence a copy of *Welch*, *supra*, F.3d 1228. The court declined to admit it into evidence but took judicial notice of the *Welch* case.

by paying for personal expenses like improvements to their home, cars, handbags, travel, and meals. And several factors indicate that Sibillo and the corporation did not actually intend for him to repay the lines of credit. Although the record contains a promissory note for the Liveofme line of credit, it does not include a promissory note for the SpyChatter line. There is no evidence that Sibillo gave collateral to secure repayment on either line of credit. Nor is there evidence that when the corporations authorized the lines of credit in 2014 and 2016, Sibillo had some source of income showing a reasonable prospect of repaying $850,000 on each line. Indeed, when repayment on the Liveofme line of credit purportedly came due in 2016, SpyChatter extended the due date to 2022 and gave Sibillo the second line of credit. And even if the corporate tax returns characterized Sibillo's withdrawals as loans, amended returns recharacterized at least some of the claimed loans as "R and D expenses." Also, the unanimous written consent authorizing the SpyChatter line of credit permitted Sibillo to withdraw up to $850,000, yet Tregillis's schedules showed that the line of credit had a balance of nearly $1 million at the end of 2018. The court could reasonably conclude from all of that evidence that the corporation was not expecting repayment for the withdrawals on the lines of credit and that Sibillo and the corporation were not treating them as bona fide loans.

Moreover, while Sibillo claimed to have repaid $900,000 total on both lines of credit, whether and to what extent he made repayments was disputed, as was the source of any repayments. Tregillis's review showed repayments of roughly $994,000 on the SpyChatter line of credit and roughly $481,000 on the Liveofme line of credit, but Wiebe said that he saw no indication in the records that Sibillo had attempted to repay the

25

claimed loans. Even if Sibillo had used his entire $120,000 salary to make repayments for the years at issue, he would not have had $900,000 or more available. Sibillo testified that he used an unspecified portion of the roughly $1 million Fazzone loan to pay down the Liveofme line of credit, but he also said that he immediately used $340,000 to $350,000 of the Fazzone loan to buy the parties' home. The evidence showed that the parties also used the Fazzone loan for improvements to the home and other personal expenses. Thus, even crediting Sibillo's testimony, the Fazzone loan could not account for anywhere near the amount that Sibillo claimed to have repaid. In addition, the corporate tax returns did not reflect any interest income from repayments, even though the terms of the claimed loans included interest. Given the conflicting evidence, the trial court had the power to reject Sibillo's evidence of repayment as not credible. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630 [on substantial evidence review, "[i]t is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact"].) The failure to make repayments was yet another important factor supporting the trial court's finding.

Sibillo contends that Wiebe was wrong when he concluded that Sibillo did not have the resources to repay $900,000 on the lines of credit. He further contends that the court erred by adopting Wiebe's incorrect conclusion and failing "to engage in any further factfinding to determine whether" Sibillo had made repayments. The argument is meritless. First, as discussed, there was a dispute about the source of Sibillo's claimed repayments, and the court was free to reject or credit the evidence as it saw fit. Second, the fact that the court did not discuss all of the evidence in support of its finding does not

26

give rise to the inference that it failed to "engage in any further factfinding." The statement of decision described the dispute between the expert witnesses about the lines of credit by summarizing some of Wiebe's testimony and also some of Tregillis's testimony. After doing so, the court stated its finding: "The court finds the purported lines of credit are in fact income [Sibillo] received . . . ." The statement of decision was not required to "contain a detailed discussion of all of the evidence *and* a discussion of why the court chose to credit some evidence while rejecting other evidence." (*Antelope Valley Groundwater Cases* (2020) 59 Cal.App.5th 241, 265.) And the failure to discuss all of the evidence does not "affirmatively show[] the court did *not* weigh the evidence in reaching its decision." (*Ibid.*)

For all of these reasons, the court did not err by finding that the SpyChatter line of credit was income for child support purposes.

III. *Timeshare Determination for Retroactive Child Support*

Sibillo argues that the record does not contain substantial evidence to support the court's finding that Delgado had a 25 percent timeshare for purposes of retroactive child support. We agree.

In addition to the parents' income, timeshare is a "crucial component" of the guideline formula for calculating child support. (*County of San Diego*, *supra*, 55 Cal.App.5th at p. 1069.) The term refers to the "approximate percentage of time that the high earner has or will have primary physical responsibility for the children compared to the other parent." (§ 4055, subd. (b)(1)(D); *County of San Diego*, at p. 1069.) "As the

timeshare of the higher income earner increases, the guideline amount of child support decreases." (*County of San Diego*, at p. 1069.)

Here, the court applied the same timeshare percentages when calculating retroactive and prospective child support—25 percent for Delgado and 75 percent for Sibillo. The court's modified visitation order supports that timeshare going forward, but there is no evidence in the record to support applying that timeshare retroactively. Before the court modified the visitation order, Delgado had visitation every other weekend from Saturday at 9:00 a.m. to Sunday at 5:00 p.m. Although the parties were supposed to work out a holiday schedule, they never did, and there is no evidence that Delgado had their child for any holidays. Accordingly, during the 20 months for which the court awarded retroactive child support (August 15, 2018, to April 15, 2020), Delgado had primary physical responsibility for the child approximately 9 percent of the time.[4]

That means that Sibillo had a timeshare of approximately 91 percent. No evidence supports a retroactive timeshare of 75 percent for Sibillo, the "high earner." (§ 4055, subd. (b)(1)(D).) The trial court therefore abused its discretion by awarding retroactive child support on that basis, and we must reverse the retroactive child support award. (*County of San Diego*, *supra*, 55 Cal.App.5th at pp. 1069, 1072.) On remand, the court shall recalculate the retroactive child support award, using Sibillo's "actual timeshare" during the relevant period—91 percent. (*Id.* at p. 1076.)

---

[4] Delgado would have had visitation for 42 weekends during the 20-month period. Each weekend visit lasted 32 hours, so she would have had the child for 1,344 hours (42 times 32). The 20 months totaled 610 days or 14,640 hours. That works out to a timeshare of roughly 9.2 percent (1,344 divided by 14,640) for Delgado.

28

## DISPOSITION

The judgment on reserved issues is reversed in part and affirmed in part.  The order awarding retroactive child support is reversed, and the matter is remanded for the trial court to recalculate the guideline amount of retroactive child support using a 91 percent timeshare for Sibillo.  In all other respects, the judgment is affirmed.  Delgado shall recover her costs of appeal, if any.  (Cal. Rules of Court, rule 8.278(a)(3).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
        J.

We concur:

MILLER
        Acting P. J.
CODRINGTON
        J.